Nos. 2--07--0173 & 2--07--0204 cons.          Filed:  2-1-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| J. MAKI CONSTRUCTION COMPANY and JOHN MAKI, SR., | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 05--L--503 |
| CHICAGO REGIONAL COUNCIL OF CARPENTERS, JOEL POGOSE, DANIEL McMAHON, and RANDY DROGOS, | ) ) ) ) | Honorable Mitchell L. Hoffman, |
| Defendants-Appellants. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| J. MAKI CONSTRUCTION COMPANY and JOHN MAKI, SR., | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 05--L--503 |
| CHICAGO REGIONAL COUNCIL OF CARPENTERS, JOEL POGOSE, DANIEL McMAHON, and RANDY DROGOS, | ) ) ) ) | Honorable Mitchell L. Hoffman, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

There once was a union that called plaintiffs' work crappy; this made plaintiffs quite unhappy; at trial, the jury filled plaintiffs' purse; but, alas, on appeal, we must reverse.

On May 10, 2006, plaintiffs, J. Maki Construction Company and John Maki, Sr., filed their second amended complaint alleging two counts of defamation against defendants, the Chicago Regional Council of Carpenters (the Union), Joel Pogose, Daniel McMahon, and Randy Drogos. In count I, plaintiffs alleged that a handbill, containing a limerick, that defendants handed out to members of the public was defamatory, imputing to plaintiffs professional incompetence. In count II, plaintiffs alleged that a banner that defendants published at public sites contained defamatory statements imputing to Maki a criminal conviction. On September 13, 2006, the trial court granted summary judgment in favor of defendants as to count II of plaintiffs' second amended complaint. A jury trial was held on count I, and on September 20, 2006, the jury found in favor of plaintiffs, awarding them $2,353,000 in damages. Defendants filed a posttrial motion for judgment notwithstanding the verdict or a new trial, which was denied on January 19, 2007. Defendants timely appealed and argue that the judgment should be reversed or, alternatively, that defendants should be given a new trial because: (1) the trial court erred in ruling that the parties were not involved in a "labor dispute" as defined by the National Labor Relations Act (the Act) (29 U.S.C. §152 (2000)); (2) plaintiffs failed to establish that defendants acted with actual malice; (3) plaintiffs failed to prove actual damages; (4) the trial court gave improper jury instructions; (5) the trial court admitted unduly prejudicial evidence; (6) the handbill was not defamatory; and alternatively (7) the jury award was excessive and must be reduced. In a consolidated appeal, plaintiffs appeal the order granting summary judgment in favor of defendants as to count II of the complaint, arguing that the trial court erred in deciding that the defense of truth applied, thereby barring the defamation claim. As to defendants' appeal, we reverse. As to plaintiffs' appeal, we affirm.

## I. BACKGROUND

A.  The Parties

Plaintiff J. Maki Construction Company is a construction contractor that builds single-family homes in Lake County, including homes in a subdivision of the Village of Johnsburg. Plaintiff John Maki is the president and owner of the company, which is a nonunion construction company.  Defendant the Chicago Regional Council of Carpenters is a labor union in Lake County.  At all relevant times, defendant Dan McMahon served as the director of field organizing for the Union; defendant Joel Pogose served as the lead organizer; and defendant Randy Drogos served as an organizer.  Between 1969 and 2005, Maki was a member of the Union.  He resigned his membership in April 2005.

B.  Pretrial

On May 10, 2006, plaintiffs filed their second amended complaint.  In count I, plaintiffs alleged defamation against defendants for conduct beginning on or about May 21, 2005, when defendants handed out a handbill to members of the public.  The handbill contained the following language:

"ACCORDING TO THE NORTHWEST HERALD PAPER CONSIDER THIS BEFORE YOU BUY:

THERE ONCE WAS A MAN NAMED MAKI, WHO DIDN'T WANT YOU TO KNOW HIS HOUSES WERE CRAPPY.

'IF MY HOMEBUYER HAS WINDOWS THAT LEAK, THEY WON'T TAKE A PEEK, AND SEE THE WHOLE HOUSE IS CRAPPY.'

SO SAID A MAN NAMED MAKI!

ONE 'LUCKY' HOMEBUYER IN JOHNSBURG IS QUOTED; [sic]

'THERE'S JUST THE ONE ISSUE: THE WINDOWS WERE INSTALLED

INCORRECTLY.'

[internet web address for Northwest Herald article]

AN INFORMED HOMEBUYER IS A SMARTER HOMEBUYER."  (Emphasis in original.)

The handbill further contained the following in small print:

"THE CARPENTERS UNION IS CURRENTLY ENGAGED IN A LABOR DISPUTE WITH MAKI CONSTRUCTION OVER THE PAYMENT OF SUBSTANDARD WAGES AND BENEFITS.  WE SEEK ONLY TO INFORM THE PUBLIC."

Plaintiffs alleged that the handbill imputed that they were unable to perform their profession competently.  The referenced article in the Northwest Herald discussed homeowners' dissatisfaction with plaintiffs' work because their homes had leaky windows caused by improper installation.

In count II of the complaint, plaintiffs alleged defamation against defendants for conduct beginning on or about December 8, 2005, when defendants posted the following banner at various locations in Lake County:

"SHAME ON STATE BANK OF THE LAKES FOR DOING BUSINESS WITH JOHN MAKI; [sic] CONVICTED OF DEFRAUDING THE UNION AND FINED $752,150.00."

Plaintiffs alleged that the banner imputed a criminal conviction to Maki, thereby establishing defamation per se to Maki individually.  Defendants filed their answer to plaintiffs' complaint, including the affirmative defenses of truth and that the Act protects otherwise actionable defamatory statements when made during a labor dispute.

On August 4, 2006, defendants filed their motion for summary judgment, arguing that (1) the use of the word "crappy" constituted nothing more than rhetorical hyperbole, incapable of having a precise definition, and (2) the statements made on the banner were true. In the motion, defendants argued that on February 14, 2005, Drogos filed internal union charges against Maki, including the specific charge that Maki was defrauding the Union. On December 3, 2005, after a hearing, the Union found Maki guilty of the charges and fined him $752,150. The banner was displayed beginning on or about December 8, 2005, and taken down by the end of March 2006. On April 5, 2006, the United Brotherhood of Carpenters and Joiners of America (the International Union) affirmed the Union's guilty verdicts but reduced the fine to $500,900.

On September 13, 2006, a hearing was held on defendants' motion for summary judgment. The trial court denied defendants' motion as to count I, finding that a genuine issue of fact remained regarding the "crappy" quote in the handbill. The trial court found that because the handbill used quotation marks, some might interpret that Maki, rather than the Union, was stating that the houses were "crappy." As to count II, the trial court found the Union's use of the word "conviction" to be appropriate and truthful and granted summary judgment in favor of defendants. Many courts describe internal disciplinary sanctions by a union as "convictions," and the trial court held that if the "Supreme Court can call this disciplinary action a conviction *** so can a union or anybody else." On September 19, 2006, the trial court ruled on several motions in limine, including defendants' motion to exclude any materials, such as the banner, that were published after the handbill. Defendants argued that post-handbill materials were irrelevant to prove their intent at the time of the handbill and would be overly prejudicial if admitted. The trial court disagreed and admitted the banner and other materials, finding that such evidence was relevant to the issue of punitive damages because plaintiffs could use such

evidence to show a pattern of conduct whereby defendants intended to harm plaintiffs' business and future business prospects. However, the court reserved its right to change its ruling upon defendants' renewed objection during trial.

### C. The Trial

Jeff Miller testified first for plaintiffs. Miller, an organizer for the Union, reported to Pogose and worked with Drogos. The only campaign that the Union conducted against plaintiffs was to inform the public that plaintiffs were paying substandard wages and benefits to their employees. The purpose of the handbill was to inform the public about a leaky window problem with homes constructed by plaintiffs. He was not certain who developed the handbill, how many were handed out, or who handed them out. Miller testified that Drogos created banners. Miller originally worked in Milwaukee but was brought in by the Union to work on this particular campaign. He did not know why the campaign was initiated but Miller himself followed Maki around, including to Maki's barber, the golf course, restaurants, and downtown Chicago. Miller would hand out materials at these places in order to inform the public of the Union's campaign against plaintiffs. Miller never heard Maki say that his houses were "crappy," and he did not actually read the newspaper article that the handbill referenced.

Pogose testified for plaintiffs next. As lead organizer, Pogose met with Drogos and Miller regarding campaigns, such as the "area standards" campaign that the Union was staging against plaintiffs. The term "area standards" means wages and benefits; therefore, the Union had an issue with the wages and benefits that plaintiffs paid their employees. The purpose of the handbill, according to Pogose, was to "inform the public about leaky windows." Despite the use of the quotation marks in the handbill, Pogose never heard Maki state that his homes were "crappy," and Pogose thought that the handbill was intended to convey the Union's opinion and

not what Maki actually said. He admitted that the Northwest Herald article contained no such quote by Maki. The use of the quotation marks was intended to draw attention to the limerick. Pogose did not know where the handbill went once it was distributed.

Drogos participated in the creation of the banners that were displayed, and he consulted with Pogose before filing internal union charges against Maki. Pogose further participated in an ambulatory picketing campaign, which involved following Maki around town and picketing wherever he was. Pogose believed that there was a certain quality in the work of a carpenter who was paid the area standards rate, and the handbill was part of the Union's area standards campaign. Specifically, Pogose testified as follows:

"Q. Now, as to quality, the issue of quality, and the payment of area standard wages, it's still your testimony, is it not, that the more someone's paid the more quality that would be expected from their work?

A. Yes.

Q. And, certainly, if you're getting paid less than the area standard rates, you would presume that the quality would be lacking, correct?

A. Could be, yes.

Q. And that's your opinion?

A. My opinion."

McMahon, who supervised Drogos and Pogose, testified next for plaintiffs. McMahon reviewed the internal union charges that Drogos filed against plaintiffs. The Union's campaign against plaintiffs centered solely on the Union's goal of upholding area standard wages and benefits, which plaintiffs were not paying. No one from the Union ever asked an employee of plaintiffs to join the Union. McMahon wrote the limerick and created the handbill at the end of

March 2005 and submitted the handbill to other Union organizers, his supervisor, and the Union's attorneys for input and approval. The Union's attorneys added the website link to the Northwest Herald article that McMahon relied on for his statement regarding the leaky windows. McMahon had no other information that the homes constructed by plaintiffs contained any problems. The article discussed complaints by owners of homes constructed by plaintiffs, specifically discussing leaky windows that caused ice buildup and water damage. McMahon testified that he used quotation marks in the handbill for emphasis, though he changed his testimony and admitted that in his deposition he stated the quotation marks were used so that the reader would conclude that Maki made the statement. McMahon admitted that he never heard Maki speak in limerick or state plaintiffs' homes were "crappy." He did not believe a reasonable person would actually think that Maki made the statements in the handbill. The intent of the handbill was to elicit a smile or laugh and to make the reader aware that the Union and plaintiffs were involved in a labor dispute. However, under cross-examination, McMahon admitted that he wanted people to think that Maki spoke the quoted words.

The goal of an area standards campaign is to make the general public aware that the area standards for wages and benefits are not being paid, undermining the standards for wages and benefits across the region. The failure of employers to pay the area standards for wages and benefits, according to McMahon, results in lower wages and benefits for all carpenters. In conjunction with the Union's area standards campaign, the handbill, which measured approximately 8½ by 11 inches, was distributed at sales offices for plaintiffs' homes or at the offices of plaintiffs' business. The handbill was handed out for approximately 2 or 2½ months.

Drogos testified next. Drogos reported to Pogose, who reported to McMahon. Drogos did not participate in the creation of any banners. While the handbill was being distributed,

Drogos was filing internal union charges against plaintiffs. In 1974, Drogos worked with Maki on a Union job, and he recalled the name in the nonunion J. Maki Construction Company. Upon further investigation, Drogos discovered that Maki was still a member of the Union, and Drogos began the internal union charges that resulted in the $752,150 fine. Under the Union's constitution, a member has an obligation to hire Union members whenever possible, and plaintiffs were in violation of this obligation. Drogos did not know if problems besides the leaky windows existed in homes built by plaintiffs. He also did not know what plaintiffs paid their employees. He denied that his goal was to aggravate or agitate plaintiffs or to harm their business. However, he admitted that notes he wrote regarding the campaign indicated that at one point the Union had completed "seven days of aggravation" and that the fact that plaintiffs' salespersons had to drop home prices was an "exceptional sign."

Terrance McGann, an attorney, testified next. McMahon sent McGann the handbill for review, and McGann reviewed the document, reviewed the Northwest Herald article, performed some research, and approved the handbill for distribution.

Maki testified next for plaintiffs. Maki owns J. Maki Construction Company, which had been in business for approximately 25 years and employed approximately 40 people. Maki was a member of the Union but J. Maki Construction Company was not affiliated with the Union. Maki had never been sued by one of his homeowners and had never been cited for violating any building code or ordinance. The Union never warned him that he could be fined for running a nonunion business, a status he never attempted to hide from the Union. After the Union filed internal charges against him, Maki was fined $752,150, but the Union never explained how it arrived at that figure. Maki appealed the fine and the Union continued its ambulatory picketing against him. He was followed from his home to his office and to other places that he went. At

those locations, Union members would display banners and hand out handbills, including others besides the handbill at issue in this appeal. However, Maki did not know if the handbill at issue was distributed at various locations to which the Union followed him, such as the golf course and his barber. Other banners and handbills were admitted over defendants' objection, but with the limiting instruction that the documents were admitted only for the purpose of showing whether defendants bore any malice towards plaintiffs at the time that the handbill in question was distributed. Some of the banners poked fun at Maki's weight and the amount of money that he was spending on attorney fees.

In response to the Union's campaign, Maki sent out to his customers and employees a letter explaining that his employees are paid by the hour on a merit-based plan and receive health insurance, access to a 401(k) savings plan, death benefits, and paid vacations. Additionally, he helped his carpenters purchase homes in subdivisions that he developed. He admitted that he paid his carpenters between $12 and $30 per hour, less than the area standard wage of approximately $48 per hour. He did not find the handbill at issue humorous, and he never stated that his homes were "crappy." There were approximately 200 homes in the Johnsburg development and, of those, 30 homeowners complained of leaking windows. The windows were installed by his carpenters using flashing tape rather than caulk, and, when the homeowners complained, plaintiffs caulked the windows. None of the homeowners had any structural damage to their homes as a result of any of the leaks. A joint letter to the homeowners from plaintiffs and the window manufacturer confirmed that there were acceptable methods of installation besides the manufacturer's recommended method of caulking and that they would honor all homeowner warranties whether still in the warranty period or not. As to damages, Maki claimed he had spent over $100,000 in legal fees.

On cross-examination, Maki admitted that while working on Union jobs, he received the area standard, including pension, health insurance, and disability benefits. He voluntarily maintained his Union membership after he began his nonunion company but was unaware of any bylaws that he had to follow as a member. He went to the National Labor Relations Board (NLRB) in the spring of 2005 to complain about the Union's picketing. He admitted that the NLRB ordered the Union to cease and desist picketing of his company but that it did not state that the Union could not continue to distribute the handbill. He admitted that the other banners and handbills and the picketing harmed his reputation as did the handbill at issue and that he was not specifically seeking lost profits. He did not have to lay off any employees due to lack of work during that time, and he believed that most people were more angry with the Union than with him. He did not know of anyone who believed the statements in the handbill.

Tommy Oliver, an organizer for the Union, testified next for plaintiffs. Oliver was not involved in the Union's campaign against plaintiffs. He stated that a home could have a leaky window and that the rest of the home could still be considered "fine."

Defendants called Michael Shipman as their first witness. Shipman was a construction superintendent for Maki's company. He saw the handbill at issue when it was distributed, and he was told by Maki to just ignore it. He was familiar with the windows that were installed in the Johnsburg homes. The manufacturer recommended that the windows be installed with caulk because the tape that plaintiffs used would not adhere properly when installed in cold weather and would begin to pull away. The leaky windows in the Johnsburg homes caused some staining, damaged oak trim, and caused mold and water damage.

Tim Lehm, Maki's son-in-law and employee, testified next for defendants. Lehm resides in a Johnsburg home that was built by plaintiffs. He admitted that windows were not installed

according to the manufacturer's recommendations and that some homeowners experienced leaky windows.

After the parties rested, the trial court ruled on various jury instructions, including three that defendants now raise in their brief. First, defendants claim that the trial court erred in instructing the jury that plaintiffs had to prove their case by a preponderance of the evidence rather than by clear and convincing evidence. Second, the trial court erred in failing to instruct the jury that plaintiffs had to prove that the statements were made with actual malice. Third, the trial court erred in defining malice as "ill will" or having "evil intentions." Defendants proffered alternative instructions but the trial court instructed the jury using plaintiffs' proffered instructions. In its rulings, the trial court found that the handbill was not published in connection with a labor dispute, and it refused to instruct the jury that plaintiffs had to prove that defendants acted with actual malice in publishing the handbill. Instead, the trial court instructed the jury that defendants had a qualified privilege to publish the handbill but lost the privilege if they acted with malice. The jury was instructed that malice meant that defendants published the "defamatory communication with wanton disregard for Plaintiffs' rights, with ill will, and with an evil intention to defame and injure Plaintiff. To find that Defendant acted with malice, you must be persuaded, considering all the evidence in the case, that it is more probably true than not true that Defendant acted maliciously as defined above." Additionally, over defendants' objection, the trial court admitted into evidence other handbills and banners, along with testimony regarding ambulatory picketing.

The jury returned a verdict in favor of plaintiffs, awarding them $2,353,000 in nonspecific damages. Defendants moved for judgment notwithstanding the verdict and, alternatively, for a new trial. On January 19, 2007, the trial court issued its order denying

defendants' motion. Specifically, the court stated that it found that the word "crappy," used in this context, could not be innocently construed, because a reasonable reader of the handbill "would be expected to conclude that the entire house ha[d] construction defects similar to leaky windows." Further, the trial court did not find a connection between the handbill and the existence of a labor dispute, citing National Labor Relations Board v. Local Union No. 1229, 346 U.S. 464, 476, 98 L. Ed. 195, 204, 74 S. Ct. 172, 178-79 (1953). It stated that "the jury may well have concluded that the handbill was little more than an attempt by the Defendants to damage Maki's business until such time as Maki complied with its demands." The trial court further stated that defendants failed to present any evidence that showed a nexus between the carpenters' wages and benefits and the quality of homes constructed by plaintiffs, noting that Pogose testified that there was no connection between the two. As to the admissibility of the other handbills and banners, the trial court noted that the proper limiting instruction was given with each admission. As to the damages issue, the trial court found that defendants waived the issue when they failed to object to the verdict form that did not itemize the verdict. However, the trial court addressed the issue despite waiver, stating that it would assume that the jury ascertained the damages award based on what plaintiffs had requested. Under that method, the jury likely granted $1.2 million in compensatory damages and the remaining $1.1 in punitive damages. The amount of punitive damages was not excessive given the guideposts for analyzing punitive damages set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 574-75, 134 L. Ed. 2d 809, 826, 116 S. Ct. 1589, 1598-99 (1996). Therefore, the trial court denied defendants' motion for judgment notwithstanding the verdict or for a new trial.

## II. ANALYSIS

### A. Defendants' Appeal

Defendants argue that the handbill at issue is not defamatory because it is nothing more than an opinion. Defendants first made this argument in the trial court in their motion for summary judgment, which was denied. The trial court found that because the handbill used quotation marks, some might interpret that Maki, rather than the Union, was stating that the houses were "crappy." Defendants again raised the argument in their posttrial motion, which also was denied based on the trial court's determination that the word could not be innocently construed. We review de novo the question of whether a statement constitutes an opinion or a factual assertion, as it is a question of law. Quinn v. Jewel Food Stores, Inc., 276 Ill. App. 3d 861, 865 (1995).

"A statement is defamatory if it tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person." Tuite v. Corbitt, 224 Ill. 2d 490, 501 (2006). Statements may be defamatory per quod or per se. Tuite, 224 Ill. 2d at 501. "A statement is defamatory per se if its defamatory character is obvious and apparent on its face and injury to the plaintiff's reputation may be presumed," whereas a plaintiff must plead and prove special damages in a defamation per quod action. Tuite, 224 Ill. 2d at 501. There are five categories of statements that constitute defamation per se: "(1) statements imputing the commission of a crime; (2) statements imputing the infection with a loathsome communicable disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business; and (5) statements imputing adultery or fornication." Tuite, 224 Ill. 2d at 501. Here, plaintiffs allege that the handbill, which characterizes their work as "crappy," was defamation per se, imputing a lack of competence in their professional ability.

However, "statements which do not contain factual assertions are protected under the first amendment and may not be the basis of a defamation action." Kolegas v. Heftel Broadcasting Corp., 154 Ill. 2d 1, 14 (1992). The test to determine whether a defamatory statement is constitutionally protected is restrictive; only statements that cannot reasonably be interpreted as stating actual facts are protected under the first amendment. Kolegas, 154 Ill. 2d at 14-15. However, couching a factual assertion as an opinion is not free from a defamatory action. Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 100 (1996). The Illinois Supreme Court has considered several nonexclusive factors in determining whether a statement constitutes an opinion or factual assertion: (1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether the statement's literary or social context signals that it has factual content. Solaia Technology, LLC v. Specialty Publishing Co., 221 Ill. 2d 558, 581 (2006).

We must now delve into the meaning of the word "crappy"--a dirty job for any court. Using the factors described, we cannot say as a matter of law that "crappy," as it is used here, implies anything more than a nonactionable opinion. First, the word "crappy" is a vague descriptive term. Webster's Dictionary defines "crappy" as "markedly inferior in quality: LOUSY." Webster's Third New International Dictionary 530 (1986). The American Heritage Dictionary defines "crappy" as "inferior, worthless" or "miserable; poorly" or "mean; contemptible." American Heritage Dictionary of the English Language ___ (4th ed. 2000). When used to describe a home, the word may mean multiple things to multiple people. The trial court concluded that "crappy" would mean that the entire house would have construction defects similar to leaky windows. We disagree, as many people may define a "crappy" house in countless ways, ranging from defects to decorating tastes. Even so, the trial court erred in

ending its analysis here; we will continue to consider the other factors used by the supreme court.

Second, the statement in the handbill cannot be verified; one cannot verify whether plaintiffs' homes are actually "crappy." In Flowers v. Carville, 310 F.3d 1118, 1126-27 (9th Cir. 2002), the plaintiff alleged defamation for the following comments by various defendants referring to the plaintiff's allegation of having an affair with then-presidential candidate Bill Clinton: (1) that the defendant would not comment on that "tabloid trash"; (2) that the Associated Press news reporter could not put that "crap on the wire"; and (3) that the defendant wrote "Another Thursday, another Star story, another garbage day." The court characterized the words "trash," "crap," and "garbage" as nothing more than "generic invective" and stated that the "law provides no redress for harsh name-calling." Flowers, 310 F.3d at 1127. The court specifically stated that these words were not defamatory whether the statements were directed at the plaintiff, the Star newspaper, or the situation as a whole. Flowers, 310 F.3d at 1127. Similarly, in Levinsky v. Wal-Mart Stores, Inc., 127 F.3d 122, 130 (1st Cir. 1997), the court concluded that the term "trashy," when used to describe the plaintiff's store, was "loose language that cannot be objectively verified" and was a vague, imprecise term. Likewise, "crappy" is imprecise, and we cannot determine a method by which to measure the "crappiness" of a home.

Finally, the literary and social context of the word "crappy" does not signal factual content. Rather, the word is used as rhetorical hyperbole. In Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, 418 U.S. 264, 268, 41 L. Ed. 2d 745, 752, 94 S. Ct. 2770, 2779 (1974), the plaintiffs filed suit against the defendant union for publishing their names in a " 'List of Scabs' " along with a document defining a scab as, among other things, one who " 'carries a tumor of rotten principles,' " is rejected by even the devil, and a traitor to his

God, country, family, and class. The Court found that the term "scab" and the definition's use of words such as "traitor" were simply words used in a "loose, figurative sense to demonstrate the union's strong disagreement with the views of workers opposing unionization." Letter Carriers, 418 U.S. at 284, 41 L. Ed. 2d at 762, 94 S. Ct. at 2781. "Expression of such an opinion, even in the most pejorative terms, is protected under federal labor law." Letter Carriers, 418 U.S. at 284, 41 L. Ed. 2d at 762, 94 S. Ct. at 2781; see also Pease v. International Union of Operating Engineers Local 150, 208 Ill. App. 3d 863, 870 (1991) (finding statements, " 'He's dealing with half a deck' " and " 'I think he's crazy,' " mere name calling, rhetorical hyperbole, or words employed only in a loose, figurative sense and thus nonactionable). Likewise, in this case, the handbill's "crappy" limerick was obviously used in a "loose, figurative sense," intending to demonstrate the Union's disagreement with plaintiffs' failure to pay the area standards. Defendants did not attempt to hide their dispute with plaintiffs, as the handbill contained a clear statement that the dispute existed.

The trial court opined that because the statement, "If my homebuyer has windows that leak, they won't take a peek, and see the whole house is crappy," was within quotation marks, it appeared that the statement was the opinion of plaintiffs rather than the Union. We disagree. The Supreme Court has addressed false attribution of quotations and has stated that, while a self-condemnatory quotation may carry more force than the criticism of another, "quotations do not always convey that the speaker actually said or wrote the quoted material." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 512, 115 L. Ed. 2d 447, 469, 111 S. Ct. 2419, 2430 (1991). The Supreme Court acknowledged that punctuation marks have many uses and that writers may use quotation marks even where no reasonable reader would assume that the quotation marks automatically imply the truth of the quoted material. Masson, 501 U.S. at 512, 115 L. Ed. 2d at

469, 111 S. Ct. at 2430. This logic clearly applies here. We cannot agree with the trial court that a reasonable reader would assume that Maki actually referred to his homes as "crappy" in limerick, simply because quotation marks were used. Thus, under the circumstances of this case, we find as a matter of law that the handbill contains nonactionable statements of opinion, and we reverse the jury verdict on count I of plaintiffs' complaint. See Bryson, 174 Ill. 2d at 100 (determining as a matter of law whether a reasonable fact finder could conclude that the allegedly defamatory statement was an assertion of fact).

### B. Plaintiffs' Appeal

In their appeal, plaintiffs argue that the trial court erred in granting defendants' motion for summary judgment on count II of the complaint. Count II alleged defamation for the following banner:

"SHAME ON STATE BANK OF THE LAKES FOR DOING BUSINESS WITH JOHN MAKI; [sic] CONVICTED OF DEFRAUDING THE UNION AND FINED $752,150.00."

Plaintiffs argued that the word "convicted" imputes a criminal conviction to Maki. The trial court ruled that the use of the word "convicted" was accurate and truthful because Maki had been convicted in internal union proceedings. On appeal, plaintiffs argue that the term "convicted" cannot be innocently construed in a noncriminal sense and that the trial court should not have looked to Supreme Court cases to determine a plain and obvious meaning of the word. In plaintiffs' opinion, the issue of whether "convicted" was defamatory should have been a question of fact for the jury. Defendants argue that the trial court was correct in deciding that the banner was truthful and argue that the innocent construction doctrine should not apply to the banner because the trial court properly decided the summary judgment motion on their affirmative

defense of truth.

"A motion for summary judgment is properly granted where the pleadings, depositions, admissions, and affidavits establish that no genuine issue of material fact exists and that the [movant] is entitled to summary judgment as a matter of law." Maxit, Inc. v. Van Cleve, 376 Ill. App. 3d 50, 54 (2007). Summary judgment is a drastic means of disposing of litigation and should be granted only where the right of the moving party is free and clear of doubt. Universal Underwriters Insurance Co. v. Judge & James, Ltd., 372 Ill. App. 3d 372, 377-78 (2007). In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party. Thomson Learning, Inc. v. Olympia Properties, LLC, 365 Ill. App. 3d 621, 626 (2006). We review de novo the trial court's ruling on a motion for summary judgment. Maxit, 376 Ill. App. 3d at 55.

As discussed, there are five categories of statements that constitute defamation per se: "(1) statements imputing the commission of a crime; (2) statements imputing the infection with a loathsome communicable disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business; and (5) statements imputing adultery or fornication." Tuite, 224 Ill. 2d at 501. However, even if a statement falls into a defamation per se category, it will not be actionable per se if it is reasonably capable of an innocent construction. Tuite, 224 Ill. 2d at 502. A statement must be considered in context, " 'with the words and implications therefrom given their natural and obvious meaning.' " Tuite, 224 Ill. 2d at 503, quoting Chapski v. Copley Press, 92 Ill. 2d 344, 352 (1982). The preliminary determination of whether the innocent construction rule applies is a question of law for the court, and whether the statement was understood to be defamatory or to refer to the plaintiff is a

question for the jury if the innocent construction issue is resolved in the plaintiff's favor.  Tuite, 224 Ill. 2d at 503.

A defendant is also not liable for a defamatory statement if the statement is true.  Wynne v. Loyola University of Chicago, 318 Ill. App. 3d 443, 451 (2000).  Only "substantial truth" is required for the defense.  Wynne, 318 Ill. App. 3d at 452.  While determining "substantial truth" is normally a question for the jury, the question is one of law where no reasonable jury could find that substantial truth had not been established.  Wynne, 318 Ill. App. 3d at 452.  Substantial truth refers to the fact that a defendant need prove the truth of only the "gist" or "sting" of the statement.  American International Hospital v. Chicago Tribune Co., 136 Ill. App. 3d 1019, 1022 (1985).

It is undisputed that at the time the banner was published, Maki had been convicted of violating the Union's bylaws and fined $752,150.  The question is whether the word "convicted" was a truthful and appropriate word to describe the situation.  We agree with the trial court that the word "convicted" was truthful and appropriate in the context of the internal union charges.  As the trial court and defendants pointed out, the Supreme Court and federal circuits have referred to internal union disciplinary actions as convictions.  See International Brotherhood of Boilermakers v. Hardeman, 401 U.S. 233, 246, 28 L. Ed. 2d 10, 21, 91 S. Ct. 609, 617 (1971); Snyder v. Freight, Construction, General Drivers, Warehousemen & Helpers, Local No. 287, 175 F.3d 680, 684 (9th Cir. 1999); Murphy v. International Union of Operating Engineers, 774 F.2d 114, 119-121 (6th Cir. 1985); National Labor Relations Board v. Oil, Chemical & Atomic Workers International Union, 619 F.2d 708, 714 (8th Cir. 1980); Feltington v. Moving Pictures Machine Operators Union Local 306, 605 F.2d 1251, 1255 (2d Cir. 1979).  Upon this court's review, we found that the Seventh Circuit has also referred to internal union disciplinary actions

as "convictions." See Curtis v. International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators of the United States & Canada, 687 F.2d 1024, 1027 (7th Cir. 1982). If the courts may characterize the Union's disciplinary action against Maki as a conviction, certainly the Union may also do so. In this case, no reasonable jury could find that the banner was not substantially true and, therefore, the trial court properly granted summary judgment to defendants. Having found that the affirmative defense of truth applied here, we need not address plaintiffs' argument that "convicted" is incapable of being innocently construed.

### III. CONCLUSION

In conclusion, we find that the handbill containing the limerick was not actionable, as it did not contain any factual assertions; thus, as to defendants' appeal, we reverse the jury verdict on count I of plaintiffs' complaint. As to plaintiffs' appeal, we affirm the trial court's granting of summary judgment in favor of defendants on count II of plaintiffs' complaint.

No. 2--07--0173, Reversed.

No. 2--07--0204, Affirmed.

GILLERAN JOHNSON and ZENOFF, JJ., concur.