2022 IL App (1st) 220208-U

No. 1-22-0208

Order filed December 8, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SMILEDIRECTCLUB, LLC, and SMILE OF TENNESSEE, P.C., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 20 L 6973 |
| DELTA DENTAL PLANS ASSOCIATION, | ) ) ) | Honorable Michael F. Otto, |
| Defendant-Appellee. | ) | Judge, presiding. |

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Plaintiffs' amended complaint alleging civil conspiracy to defame, disparage, and tortiously interfere with plaintiffs' business relations was properly dismissed with prejudice based on plaintiffs' failure to sufficiently allege malice and thereby defeat defendant's qualified privilege regarding the challenged statements.

¶ 2   Following the dismissal of six counts of their seven-count, third amended complaint, plaintiffs SmileDirectClub, LLC (SDC) and Smile of Tennessee, P.C. (Smile PC) voluntarily dismissed their remaining count and appealed only the dismissal of four counts of their claims

against defendant Delta Dental Plans Association (Delta Dental) for civil conspiracy to defame, disparage, and tortiously interfere with plaintiffs' business relations.

¶ 3    On appeal, plaintiffs argue that they made sufficient allegations of malice based on Delta Dental's knowledge of the falsity and/or reckless disregard of the truth of statements about the do-it-yourself nature of plaintiffs' clear aligner therapy for purposes of defeating Delta Dental's qualified privilege regarding plaintiffs' civil conspiracy claims based on the underlying torts of defamation, disparagement and tortious interference with plaintiffs' business relations.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6    According to the well-pleaded facts of the pleadings and reasonable inferences drawn therefrom, and the external submissions of the parties, plaintiff SDC, an oral care company, offers dental support organization services and a "med tech platform" that enable licensed dentists and orthodontists to treat patients with mild to moderate malocclusion with clear aligner therapy using a teledentistry platform. Plaintiff Smile PC is a professional corporation that does business by and through licensed dentists and orthodontists and contracts with SDC to allow these dentists and orthodontists to access SDC's teledentistry platform to treat their patients.

¶ 7    Defendant Delta Dental is a nonprofit association of 39 member companies that provide Delta Dental-branded dental insurance and dental plan administrative services to insureds and employers throughout the United States and Puerto Rico. Delta Dental, by and through its affiliated

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

member companies, provides insurance for approximately 75 million people nationwide, and approximately 25% of SDC's customers were insured by Delta Dental affiliates.

¶ 8    Plaintiffs offered the dental service of aligner therapy as a remote alternative to traditional in-office orthodontics. They advertised their product in part by emphasizing the convenience they provided to customers by offering a dental care solution that did not require visits to a traditional dentist's office. To begin the service, customers bought kits that SDC sold on its website. Using the kits, the customers created an impression of their teeth. In the alternative, the customers could visit retail locations to have scans taken of their teeth by a lab technician. After either approach, a lab technician used the information gathered about the customer's teeth to create a plan for further dental work. After the plan was reviewed and approved by an SDC-affiliated dentist, plaintiffs manufactured plastic aligners and shipped the product to their customers along with instructions for use. After the customer received the aligners, the customer uploaded photos of the aligners on their teeth for review by an SDC-affiliated dentist. Customers were instructed to check in with an SDC-affiliated dentist at least once every sixty days.

¶ 9    In 2017, the American Dental Association (ADA) passed resolution 50, which "strongly discourage[d] the practice of do-it-yourself orthodontics because of the potential harm to patients." The ADA expressed concern over the lack of sufficient, active participation by a licensed dentist in the various phases of orthodontic treatment, which normally require a dentist to perform an initial oral exam, obtain and review periodontal and radiographic studies of gums, teeth and bones, plan the patient's course of treatment, conduct periodic progress assessments, and make a final assessment and decide on stabilizing measures.

¶ 10    In 2019, the ADA filed a citizen petition with the Federal Drug Administration (FDA) asserting that SDC's aligner therapy violated the Federal Food, Drug & Cosmetic Act (21 U.S.C. § 301 *et seq.*), by evading the requirement that clear aligners be "by prescription only" because "SDC has virtually eliminated from the process any substantive participation by a dentist in a customer's teeth straightening treatment even with respect to the all-important comprehensive oral examination that should precede prescribing treatment in every instance." The ADA argued that the aligner therapy skirted the "by prescription only" requirement by shifting too much responsibility to the consumer, creating a risk of serious complications and injury. Citing the affidavit of a licensed dentist filed in support of its citizen petition, the ADA explained that SDC's process "fails to meet the standard of care for a comprehensive oral examination and does not provide a basis upon which a valid prescription for orthodontic care can be written."

¶ 11    The ADA argued that self-made dental impressions were "almost inherently of little clinical value" because it was "difficult for a trained, experienced professional to make good dental impressions of a patient's teeth even in the controlled environment of an office equipped to take and retake such impressions, and it is important to be able to see and examine the patient while the impressions are being taken." The self-made photos and scans made at SDC's retail shops suffered from the same lack of clinical value as the self-administered impression kits because the photos might not properly show the position and alignment of the customer's molars due to lighting issues and the photographer's skill level. Another shortcoming of SDC's aligner therapy process was that, in lieu of a comprehensive, in-person oral exam by a licensed dentist, SDC invited its customers to simply "self-certify" that nothing was wrong with their teeth and gums and that they had been thoroughly examined by their own dentist. The customer was not asked to provide any

of their dental records or any other evidence of oral health, nor was an SDC dentist obligated to verify the accuracy of the information in the customer's self-certification.

¶ 12    The ADA's petition was supported by SDC customer complaints to the Better Business Bureau describing issues with the aligner therapy, including "excruciating pain, possible nerve damage"; "teeth fanned out, roots showing through gums"; "after treatment mouth doesn't close all the way, back teeth don't touch, jaw pain from bite problem"; "cannot fully close bite, have problems with chewing." The ADA was also harshly critical of SDC's marketing strategy, which the ADA characterized as highly misleading. Specifically, SDC's website and product packaging showed examples of people with severe malocclusion, suggesting that the aligner therapy could correct such a severe misalignment. The ADA explained that while it supports safe and effective teledentistry, it did not consider SDC's platform to be "valid" teledentistry because SDC's affiliated dentists did "not interact with customers in real time or in any other way."

¶ 13    Based on the same concerns, the American Association of Orthodontists (AAO) filed complaints against SDC with at least 35 state dental boards, alleging that SDC was engaged in the unauthorized practice of dentistry.

¶ 14    On January 6, 2020, seven members of Congress sent a letter to the FDA and the Federal Trade Commission (FTC) expressing their "strong support of the FDA and the FTC investigating the practices of SmileDirectClub to ensure that it is not misleading consumers or causing patient harm."

¶ 15    During the pandemic, an ADA policy statement recognized that teledentistry examinations "can be an effective way to extend the reach of dental professionals" provided that the "services delivered via teledentistry [were] consistent with how they would be delivered in person" and a

"dentist who uses teledentistry [has] adequate knowledge of the nature and availability of local dental resources to provide appropriate follow-up care to a patient following a teledentistry encounter."

¶ 16    Meanwhile, Delta Dental issued a policy directive to its members for the denial of all claims for coverage of SDC clear aligners. Accordingly, Delta Dental members issued insurance claim denial letters to insureds seeking coverage for treatment with SDC's clear aligners. The denial letters referenced, in varying terms, the self-application and mail-order nature of SDC's services as the reason for coverage denial.

¶ 17    SDC in late 2017 and early 2018 submitted to Delta Dental the addresses and tax identification numbers of several affiliated dentists and orthodontists for purposes of registering them in Delta Dental's electronic provider database, which was an essential step in having dental services covered under Delta Dental's insurance. Plaintiffs' attempts at registration were rejected by Delta Dental, as were subsequent attempts later in 2018 and again in 2019.

¶ 18    In February 2018, Delta Dental of Washington posted an article written by Kyle Dosch, D.D.S., who was a member of Delta Dental's dental committee and the dental director of Delta Dental of Washington. The article, titled "At-Home Invisible Aligners and Your Dental Coverage," warned consumers of dangers and risks associated with "do it yourself" orthodontic-treatment systems. The article, which did not specifically name SDC,[2] generally stated that reliance on at-home systems without the trained expertise of orthodontists can cause "long-term problems"

_____

[2] Plaintiffs alleged that although Dr. Dosch's article did not specifically name SDC, the reference to SDC was implicit due to SDC's position as the leading teledentistry service provider in February 2018.

with dental health. The article ended with the conclusion that "DIY treatments, orthodontic or otherwise, are not a covered benefit."

¶ 19    SDC attempted to persuade Delta Dental multiple times in 2017 and 2019 during in-person meetings and by written communications to change its orthodontic claims processing policy regarding insurance coverage for aligner therapy. The gist of these communications was that SDC told Delta Dental that a licensed dentist was involved in the clinical aspects of the aligner therapy and that aligner therapy was overseen by licensed dentists and was not a do-it-yourself or self-administered or self-applied therapy. Delta Dental conveyed these communications with SDC to Delta Dental's members via Delta Dental's dental policy committee, on which member representatives sat.

¶ 20    In 2020, plaintiffs sued Delta Dental and Delta Dental of Illinois for defamation, tortious interference, and deceptive trade and business practices. Plaintiffs later dismissed Delta Dental of Illinois pursuant to an agreement.[3] Ultimately, plaintiffs filed a seven-count, third amended complaint against Delta Dental only, alleging (relevant to this appeal) that Delta Dental and its member companies wrongfully denied insurance benefits to their insureds for the cost of plaintiffs' dental aligner therapy as part of a conspiracy to defame, disparage and interfere with plaintiffs' teledentistry business. Specifically, plaintiffs alleged, in relevant part, that Delta Dental and its members caused insurance claim denial letters to be issued to insureds that denied coverage for treatment with clear aligners provided through SDC's teledentistry platform on the knowingly false basis that licensed dentists do not supervise such treatment. Plaintiffs alleged that many

---

[3] In their operative amended complaint, plaintiffs substituted Delta Dental of California for Delta Dental of Illinois as the "primary exemplar" member company. Delta Dental of California is not a defendant in this case. The parties agree that because Illinois and California law are materially the same, there is no need for a choice of law analysis in this case.

consumers, upon receiving these denial notices, elected not to pursue or continue SDC's aligner therapy because of the lack of coverage. Plaintiffs alleged several instances of coverage denial letters issued by Delta Dental members to SDC customers. Each letter referenced, in varying terms, the self-application and mail-order nature of SDC's services as the reason for coverage denial. Plaintiffs also alleged that Delta Dental rejected with no basis the registration of SDC-affiliated dentists as part of Delta Dental's anti-SDC directive and for the specific purpose of avoiding responsibility for coverage of SDC's teledentistry services.

¶ 21   Plaintiffs' allegations that Delta Dental acted with malice are based on Delta Dental's and its members' alleged knowledge that the aligner therapy was overseen by licensed dentists, and SDC's argument that the ADA has a history of anti-competitive behavior. Specifically, plaintiffs claimed that they told Delta Dental of California on three occasions in 2018 and 2019 that the aligner therapy was overseen by state-licensed dentists by stating that (1) "SDC aligner therapy was overseen by licensed dentists," (2) "licensed dentists were involved in all aspects of SDC aligner therapy," and (3) "please note we do not believe the [do-it-yourself] label is applicable in any way to our platform given the oversight and responsibility for care that is solely placed with treating doctors."

¶ 22   Regarding their allegations that the ADA is a biased, anticompetitive organization, plaintiffs claimed that the ADA was not a health organization or a standards body and did not set the standard of care in the field of dentistry. Rather, the ADA was a powerful trade organization made up of market participants. Plaintiffs also alleged that the ADA has a documented history of anti-competitive conduct when it came to innovative products that reduce dentist revenue. For example, plaintiffs alleged that over 60 years ago, the ADA campaigned against dental therapists,

which are midlevel providers, as "lesser-trained" providers, but the FTC repudiated the ADA's position, stating that the ability of dental therapists to work without a dentist on site was particularly important in underserved areas where dentists might not be available. Plaintiffs also cited the ADA's unsuccessful attack on teeth whitening products as unsafe. In May 2019, the FDA denied the relief requested in the ADA's April 25, 2019 petition to the FDA about SDC.

¶ 23    Delta Dental moved to dismiss plaintiffs' third-amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020)), arguing, *inter alia*, that the statements plaintiffs challenged as defamatory or disparaging were not actionable because plaintiffs failed to sufficiently allege malice to overcome Delta Dental's qualified privilege. Delta Dental also argued that the challenged statements were protected by the privilege of fair comment and criticism and were nonactionable opinions.

¶ 24    On January 25, 2022, the circuit court dismissed counts I to VI of the third amended complaint with prejudice, ruling that a qualified privilege applied to the member companies' statements about the self-administered nature of plaintiffs' aligner therapy because those companies had a legal duty to explain to their insureds the reasons for the companies' denials of the insureds' insurance claims. The court also ruled that plaintiffs failed to sufficiently allege malice to overcome the qualified privilege given the evidence of the public controversy over the safety and efficacy of plaintiffs' aligner therapy. Specifically, the court cited evidence of the proceedings before the FDA and a request by seven members of Congress that the FDA and FTC investigate the marketing and safety of plaintiffs' aligner therapy product.

¶ 25    To pursue an immediate appeal, plaintiffs voluntarily dismissed their remaining count of intentional tortious interference and appealed only the dismissal of their claims against Delta

Dental for civil conspiracy to defame (count I), disparage (count II), and tortiously interfere with the business relations of SDC (count III) and of Smile PC (count IV).

¶ 26                                    II. ANALYSIS

¶ 27    "A motion to dismiss under section 2-615(a) of the Code (735 ILCS 5/2-615(a) (West 2020)) tests the legal sufficiency of the complaint, whereas a motion to dismiss under section 2-619(a) of the Code (735 ILCS 5/2-619(a) (West 2020)) admits the legal sufficiency of the complaint, but asserts affirmative matter outside the complaint that defeats the cause of action." *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). Section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2020)) permits a party to combine a section 2-615 motion to dismiss based upon a plaintiff's substantially insufficient pleadings with a section 2-619 motion to dismiss based upon certain defects or defenses. When ruling on a motion to dismiss under either section 2-615 or section 2-619, the court must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences from those facts in favor of the nonmoving party. *Lykowski v. Bergman*, 299 Ill. App. 3d 157, 162 (1998).

¶ 28    Under a 2-615 motion, the court may consider "only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record." *K Miller Construction Company v. McGinnis*, 238 Ill. 2d 284, 291 (2010). In ruling on a 2-619 motion, the court may consider external submissions of the parties including depositions and affidavits (*Zedella v. Gibson*, 165 Ill. 2d 181, 185 (1995)); however, the evidentiary material cannot contradict the pleadings because 2-619 motions admit the truth of the well-pleaded facts (*Stone v. McCarthy*, 158 Ill. App. 3d 569, 572 (1987)).

¶ 29    We review dismissals under sections 2-615, 2-619, and 2-619.1 *de novo*. See *Reynolds v. Jimmy John's Enterprises*, LLC, 2013 IL App (4th) 120139, ¶¶ 25, 31. Under *de novo* review, the reviewing court performs the same analysis the trial court would perform with no deference shown to the trial court's judgment. *Beauchamp v. Dart*, 2022 IL App (1st) 210091, ¶ 8.

¶ 30                          A. Civil Conspiracy to Defame and Disparage

¶ 31    Plaintiffs first argue that the statements in the insurance coverage claim denial letters that members of Delta Dental issued to insureds were defamatory and disparaging because those statements gave the do-it-yourself or self-application nature of the aligner therapy as the reason for the coverage denial even though Delta Dental and its members knew that licensed dentists supervised the aligner therapy.

¶ 32    Delta Dental responds that the parties' dispute involves the extent to which licensed dentists were involved in the care of insureds who bought plaintiffs' remote access, self-administered orthodontic therapy. Delta Dental argues that the challenged statements were substantially true, and truth is an absolute defense to a defamation action. See *Hnilica v. Rizza Chevrolet, Inc.*, 384 Ill. App. 3d 94, 97 (2008); see also *J. Maki Construction Co. v. Chicago Regional Council of Carpenters*, 379 Ill. App. 3d 189, 203 (2008) (the statement at issue need not be completely accurate; the defense applies if "the gist or sting of the statement is true").

¶ 33    The truth of a statement is usually a question for the jury, but the question is one of law if "no reasonable jury could find that substantial truth had not been established." *Id*. Alternatively, this court will review whether the challenged statements are subject to a qualified privilege.

¶ 34    The elements of civil conspiracy are (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose

by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004).

¶ 35    To show a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009).

¶ 36    Disparagement is defined as "statement[s] about a competitor's goods which [are] untrue or misleading and [are] made to influence or tend to influence the public not to buy." *Lexmark International Inc. v. Transportation Insurance Company,* 327 Ill. App. 3d 128, 140 (2001). "The definition of disparagement *** [can] be broken down into three elements. The statement (1) must be about a competitor's goods or services, (2) must be untrue or misleading, and (3) must have been made to influence or tend to influence the public not to buy those goods or services. *Pekin Insurance Co. v. Phelan*, 343 Ill. App. 3d 1216, 1220 (2003).

¶ 37    Defamatory statements may not be actionable if immunized by an absolute privilege (*Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966, 969 (1991)), if shielded under the innocent construction rule (*Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 11 (1992)), if safeguarded as an expression of opinion (*Mittelman v. Witous*, 135 Ill. 2d 220, 239 (1989)), or if protected by a qualified privilege (*Kuwik v. Starmark Star Marketing and Administration, Inc.*, 156 Ill. 2d 16 (1993)). Whether or not an allegedly defamatory statement is protected by an absolute or qualified privilege is a question of law to be determined by the court. *Adco Services, Inc. v. Bullard*, 256 Ill. App. 3d 655, 659 (1993).

¶ 38    To determine whether a conditional privilege exists, "a court looks only to the occasion itself for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged." *Kuwik*, 156 Ill. 2d at 27. The Illinois Supreme court adopted the approach to qualified privilege from the Restatement (Second) of Torts. *Id.*; Restatement (Second) of Torts § 593 through 599 (1977). Under such analysis, three classes of conditionally privileged occasions are recognized: situations in which (1) some interest of the person who publishes the defamatory matter is involved, (2) some interest of the person to whom the matter is published or of some other third person is involved, and (3) a recognized interest of the public is concerned. *Kuwik*, 156 Ill. 2d at 29.

¶ 39    In *Kuwik*, the plaintiff chiropractor filed a libel action against certain insurance carriers and their employees for statements made in two letters. The supreme court held that the qualified privilege, as a matter of law, protected the two challenged letters. The first letter was sent to a health insurance claimant by her insurance carrier denying her claims for treatment by the plaintiff. Following the issuance of this first letter, the plaintiff filed a formal complaint with the Illinois Department of Insurance. The second letter was sent to the Department of Insurance by the insurance carrier's parent company in response to the formal complaint filed by the plaintiff. The supreme court reasoned that

> "the first letter was sent because of a legal duty [citation], and that both letters were sent
> on occasions where not only the interests of defendants [*i.e.*, the insurance carriers and
> their employees] were involved, but where plaintiff's [*i.e.*, the chiropractor] and [the
> insured's] interests were involved as well. The letters were sent on occasions where a

misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information." *Id*. at 30.

¶ 40     In accordance with *Kuwik*, we find that the present situation involves not only the first category of conditionally privileged occasions—*i.e.*, the interests of Delta Dental and its members, who published the alleged defamatory statements because they are required by law to inform the insureds of the reason for a claim denial—but also "some interest of the person to whom the matter is published" as stated in the second category of conditionally privileged occasions. In the instant case, the insureds (*i.e.*, the person to whom the matter is published) clearly have an interest in learning the reasons for the denial of their claims. See *Kuwik*, 156 Ill. 2d at 29 (an insurance company's letters that provided the company's rationale for denial of coverage were privileged because such an explanation was required by Illinois insurance law); *Dark v. United States Fidelity & Guaranty Co.*, 175 Ill. App. 3d 26, 36 (1988) (statements explaining the basis for the insurer's denial of the insured's claim are protected by a qualified privilege).

¶ 41     Because we find that the statements included in the insurance claim coverage denial letters to the insureds are protected by qualified privilege, we need not address Delta Dental's alternative argument regarding the absolute privilege of opinions. See *Baraket v. Matz*, 271 Ill. App 3d 662, 669 (1995).

¶ 42     The scope of protection afforded by qualified privilege can be exceeded, thereby abusing and thus defeating the privilege. Therefore, the inquiry next becomes whether or not the privilege was abused. Whether the privilege was abused is generally a question of fact to be determined by the jury. *Kuwik*, 156 Ill. 2d at 27, 30. However, plaintiff's complaint was dismissed by a motion under section 2-619 of the Code, which provides a method to obtain "a summary disposition of

issues of law or of easily proved issues of fact, with a reservation of jury trial as to disputed questions of fact." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993).

¶ 43 The qualified privilege serves to enhance a defamation plaintiff's burden of proof. *Kuwik*, 156 Ill. 2d at 24. The privilege may protect the speaker from liability regardless of the statement's contents. *Id*. To overcome the privilege, the plaintiff must show not just that the statements are untrue, but that the defendant abused the privilege by intentionally publishing false material or by displaying a reckless disregard as to its truth or falsity—meaning that the defendant entertained serious doubts about the truth of the statement but failed to properly investigate the truth. *Id*. Abuse of a privilege may also occur when the defendant fails to limit the scope of the material, or send the material to only the proper parties. *Id*. at 30.

¶ 44 Here, plaintiffs have presented no evidence that Delta Dental or its members abused the qualified privilege, either by intentionally making false statements or by acting with reckless disregard as to the truth of the challenged statements. Delta Dental claims that the statements were true, and nothing in the record raises an issue of fact as to whether, at the time the statements were made, Delta Dental and its members entertained doubts about whether SDC affiliated dentists were not directly involved in crucial aspects of SDC's alignment therapy process. Furthermore, the statements were limited in scope to explaining the reason for the denial of insurance coverage and were sent only to the insureds.

¶ 45 Delta Dental is not required to agree with plaintiffs' statements regarding the sufficiency of the supervision licensed dentists provided to SDC's alignment therapy. Thus, even if plaintiffs told Delta Dental that a licensed dentist was involved in the clinical aspects of the aligner therapy and that aligner therapy was overseen by licensed dentists and was not a do-it-yourself or self-

administered or self-applied therapy, plaintiffs' statements were not dispositive as to whether Delta Dental and its members abused the qualified privilege in making the statements in question. Delta Dental and its members were entitled to disagree with plaintiffs regarding the sufficiency of the level of dentist supervision in SDC's alignment therapy, and plaintiffs did not allege that Delta Dental and its members unreasonably or in bad faith relied on the ADA's critical analysis of SDC's alignment therapy.

¶ 46 Plaintiffs never alleged that the aligner therapy involved any in-person examinations by an SDC-affiliated dentist, or that radiographic images were taken and reviewed by an SDC-affiliated dentist at any stage of the process. Although plaintiffs alleged that SDC-affiliated dentists conducted "reviews," plaintiffs never stated what a review entailed or how frequently a dentist was involved after the initial therapy plan was created by the SDC lab technician.

¶ 47 Although SDC customers were instructed to check in with an SDC-affiliated dentist at least once every 60 days, there was no allegation that customers were required to check in, even to confirm, for example, that the customer was ready to begin using the next set of aligners in a proposed treatment plan.

¶ 48 Delta Dental properly investigated the matter. Delta Dental and its members had the benefit of publicly available investigations by disinterested experts—the ADA, the AAO, and state dental boards. Moreover, plaintiffs affirmatively alleged that Delta Dental conducted its own investigation by requesting and receiving information from SDC and engaging in internal deliberations about whether to provide benefits for aligner therapy. The record establishes there was substantial public controversy over the degree of dentist involvement in the aligner therapy and its impact on the safety and efficacy of the therapy.

¶ 49 Delta Dental's and its members' statements about the lack of supervision by licensed dentists are protected by a qualified privilege. Furthermore, they did not make the statements with knowledge of or reckless disregard for their falsity, fail to limit the scope of the statements properly, or send them to improper parties.

¶ 50 While the court must view the allegations in a light most favorable to the plaintiffs for purposes of a motion to dismiss, such standard still does not save plaintiffs' allegations from being more than conclusory allegations that are insufficient to raise an inference of actual malice. See *Edwards v. University of Chicago Hospitals & Clinics*, 137 Ill. App. 3d 485, 491 (1985) (the conclusory allegations in plaintiff's amended complaint that defendant published the allegedly defamatory diagnosis maliciously intending to injure her and to bring her into public scandal, disrepute and disgrace were, in and of themselves, insufficient to raise an inference of actual malice.)

¶ 51 We conclude that plaintiffs failed to allege malice sufficient to show that Delta Dental and its members abused the qualified privilege. Under the standards enunciated for a section 2-619 dismissal, we find no disputed issues of material fact for a jury to consider and hold that defendant is entitled to judgment as a matter of law on the defamation and disparagement counts relating to the insurance coverage denial letters. Accordingly, we affirm the trial court's dismissal of plaintiffs' claims regarding defamation and disparagement with prejudice.

¶ 52 B. Civil Conspiracy to Interfere with Business Relations

¶ 53 To state a cause of action for tortious interference with business relations, a plaintiff must allege (1) the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy, (2) knowledge of the relationship or expectancy on the part

of the interferer, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill. App. 3d 359, 362-63 (1973). A plaintiff alleging a claim for tortious interference must allege facts demonstrating malice in order to overcome a motion to dismiss. *Strosberg v. Brauvin Realty Service*, 295 Ill. App. 3d 17, 33 (1998).

¶ 54    Even if plaintiffs' interference claims were factually sufficient to survive dismissal, these claims must be dismissed based on a similar issue of privilege as addressed above. Illinois courts recognize a privilege against a claim for tortious interference " 'where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights.' " *Zdeb v. Baxter International, Inc.*, 297 Ill. App. 3d 622, 632 (1998) (quoting *HPI Health Care Services Inc. v. Mt. Vernon Hospital Inc.*, 131 Ill. 2d 145, 157 (1989)).

¶ 55    The challenged statements by Delta Dental and its members in the letters to the insureds were to explain its denial of coverage, as is required by section 154.6(n) of Illinois' Insurance Code (215 ILCS 5/154.6(n) (West 2020)). See *International Administrators, Inc. v. Life Insurance Company of North America*, 753 F. 2d 1373, 1381 (7th Cir. 1985) (granting summary judgment to insurance company on tortious interference claim because insurance company's statements in non-renewal letters to insureds were of equal or greater value to the interests of the plaintiff); *Kuwik*, 156 Ill. 2d at 29; *Dark*, 175 Ill. App. 3d at 36.

¶ 56    Similar to this court's analysis on the defamation and commercial disparagement claims, plaintiffs' attempts to plead malice were insufficient. They failed to provide supporting details beyond conclusory statements of malicious intent to sustain their claims.

¶ 57                          III. CONCLUSION

¶ 58    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 59    Affirmed.