No. 2-09-1015    Filed: 10-18-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| STEVE SANDHOLM, | ) | Appeal from the Circuit Court |
| | ) | of Lee County. |
| Plaintiff-Appellant and | ) | |
| Cross-Appellee, | ) | |
| | ) | |
| v. | ) | No. 08--L--19 |
| | ) | |
| RICHARD KUECKER, ARDIS KUECKER, | ) | |
| GLEN HUGHES, AL KNICKREHM, TIM | ) | |
| OLIVER, DAN BURKE, DAVID DEETS, | ) | |
| MARY MAHAN-DEATHERAGE, NRG | ) | |
| MEDIA, LLC, GREG DEATHERAGE, | ) | |
| ROBERT SHOMAKER, and NEIL | ) | |
| PETERSEN, | ) | |
| | ) | |
| Defendants-Appellees and | ) | |
| Cross-Appellants | ) | Honorable |
| | ) | David L. Jeffrey, |
| (Michael Venier, Defendant-Appellee). | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, Steve Sandholm, appeals the trial court's dismissal of his complaint, which alleged various counts of defamation, false light, and tortious interference, against defendants, Richard Kuecker, Ardis Kuecker, Glen Hughes, Michael Venier, Al Knickrehm, Tim Oliver, Dan Burke, David Deets, Mary Mahan-Deatherage, NRG Media, LLC, Greg Deatherage, Robert Shomaker, and Neil Petersen. The trial court dismissed plaintiff's complaint upon finding that the Citizen Participation Act (Act) (735 ILCS 110/1 et seq. (West 2008)) provided defendants immunity from

the claims alleged by plaintiff. Plaintiff appeals, arguing that the Act is unconstitutional and, alternatively, does not apply to the facts alleged in his complaint. Except Venier, defendants cross-appeal the attorney fee award, arguing that the trial court improperly limited the fees they could recover to those connected to the motion to dismiss. We affirm the judgment of the trial court on all points.

## I. BACKGROUND

This is a case of first impression involving interpretation of the Act, Illinois's anti-SLAPP ("Strategic Lawsuit Against Public Participation") statute. The term "SLAPP" was developed by University of Denver professors George Pring and Penelope Canan, and the "Public Participation" referred to involves concerned citizens acting primarily on matters relating to the public interest. See M. Sobczak, SLAPPed in Illinois: The Scope and Applicability of the Illinois Citizen Participation Act, 28 N. Ill. U. L. Rev. 559, 563 (Summer 2008). In a typical SLAPP case, citizens oppose a developer's plan and petition their local government to stop the developer in some way. The developer then sues the citizens for intentional interference with prospective business and eventually the lawsuit is thrown out, but the citizens are financially strained in the process of defending the suit.

While the Act's clear objective as an anti-SLAPP statute is to provide citizens with an immediate way to dispose of such lawsuits, the Act was written more broadly than such statutes in other states and more broadly than Pring and Canan had defined. SLAPP lawsuits were originally defined as involving a right to petition and a matter of public concern. M. Sobczak, SLAPPed in Illinois: The Scope and Applicability of the Illinois Citizen Participation Act, 28 N. Ill. U. L. Rev. 559, 573 (Summer 2008). The Act exceeds that definition by including the rights to speak, assemble, or otherwise participate in government, and it is not limited to matters of social or civic

concern. The ramifications of the Act are presented before this court in the context of a defamation lawsuit. The facts below are derived from the record before us.

On April 25, 2008, plaintiff filed his initial complaint, which was later amended on May 9, 2008, June 27, 2008, and November 17, 2008. The third amended complaint alleged the following. Plaintiff was hired as a teacher and head basketball coach at Dixon High School for the 1999-2000 school year. For the 2003-04 school year, plaintiff was assigned the additional position of athletic director for Dixon High School. Plaintiff had always received positive performance evaluations during his time at Dixon High School. Beginning in February 2008, defendants started a campaign to have plaintiff removed as basketball coach and athletic director due to their disagreement with his coaching style. Defendants approached principal Michael Grady, superintendent James Brown, and members of the Dixon School District Board to complain about plaintiff's coaching style and performance. When the board and school administration did not remove plaintiff from those positions, defendants continued to campaign against him, forming a group known as the "Save Dixon Sports Committee."

Count I alleged defamation per se against Richard Kuecker. Richard published defamatory statements concerning plaintiff's abilities as a basketball coach and athletic director. Attached to the complaint was a February 28, 2008, letter that Richard authored and published on the "Save Dixon Sports" Web site. The letter made defamatory and false statements including that plaintiff only criticized athletes, badgered, humiliated, and bullied players, and was excessively abusive. Richard sent to the school board a petition making similar accusations, which was also posted on the Web site. On March 21, 2008, on WIXN radio, AM 1460, Richard, along with Michael Venier, Glen Hughes, and Al Knickrehm, discussed his dissatisfaction with the school board's failure to remove

plaintiff as coach. Knickrehm was the general manager of the radio station, and he had requested that the others appear on the program. Richard stated on the program that plaintiff adversely performed his job, that his coaching philosophy was to verbally abuse, bully, discourage, and desecrate players, and that plaintiff needed to be fired. Richard, along with other members of the "Save Dixon Sports Committee," posted the radio program on its Web site through April 10, 2008. Also posted on the Web site were additional statements from Richard and others criticizing plaintiff's coaching style and the school board's failure to remove him as coach and athletic director. Richard e-mailed to Matt Trowbridge, a reporter for the Rockford Register Star, defamatory statements, including that plaintiff was a bad coach and an embarrassment to the community and that his abusive behavior amounted to bullying.

An April 10, 2008, letter addressed to Doug Lee, the president of the Dixon school board, was signed by Richard and other members of the "Save Dixon Sports Committee" and published on the Web site. The letter described plaintiff as verbally abusive and unfit to hold the positions that he held. The letter further described defendants' complaints about the school board and the administration not conducting a full investigation and their failure to address the complaints at a March 19, 2008, school board meeting. On April 16, 2008, Richard told a reporter for the Rockford Register Star that the situation was not about plaintiff's coaching ability but about his verbal abuse.

Count I alleged that Richard's defamatory statements: imputed to plaintiff an inability to perform his job and/or a lack of integrity in the discharge of his duties; prejudiced plaintiff's ability to perform his duties; and implied that he engaged in criminal activity.

Count II alleged defamation per se against Glen Hughes and reiterated much of the same conduct alleged against Richard. Count III alleged defamation per se against Michael Venier and

reiterated much of the same conduct alleged against Richard. An e-mail dated March 11, 2008, that Michael sent to a Dixon school board member was also attached. The e-mail criticized plaintiff for his "criticizing to the brink of abuse, demands bordering on slavery, [and] serious void of true citizenship." Count IV alleged defamation per se against Tim Oliver, alleging much of the same conduct alleged against Richard and the others. Counts V and VI alleged defamation per se against Dan Burke and Mary Mahan-Deatherage, respectively, alleging much of the same conduct alleged against Richard and the others. In addition, on April 24, 2008, Mary was quoted in the Dixon Gazette, "Why does there have be an instance of where someone is shoved or pushed? Why can't all these instances of abuse over 10 years...isn't that enough to fire him?" Counts VII and VIII alleged defamation per se against David Deets and Greg Deatherage, respectively, and alleged much of the same conduct alleged against the others. Additionally, Greg was alleged to have published Richard's February 28 letter on the Northern Illinois Sports Beat Web site. On March 23, 2008, Greg published on that Web site statements that plaintiff was a "psyco [sic] nut [who] talks in circles and is only coaching for his glory" and that he did not care about the players. On April 10, also on that site, Greg wrote about plaintiff, "It is his twisted pshyco [sic] babble and his abuse of power that we have had enough of" and that plaintiff was a tough, old school coach who tried to break the players down. Greg also allegedly wrote on the Web site saukvalleynews.com that plaintiff abused his power, that plaintiff claimed that girls' sports were not really sports, that plaintiff stated that the Dixon Boosters were a bunch of losers, that plaintiff thought that anyone who did not play basketball was not loyal, and that plaintiff stated that he did not owe the people of Dixon anything.

Count IX alleged defamation per se against Ardis Kuecker, alleging much of the same conduct alleged against the others. In addition, a letter to the editor written by Ardis was attached.

Ardis's letter was published on March 26, 2008, and stated that plaintiff utilized verbal and emotional abuse, bullying, and belittling in his coaching style. On March 12, 2008, Ardis stated to superintendent James Brown that during timeouts plaintiff yelled instead of prepared, that he would pick out a "whipping boy" each year, that he was a negative person, and that she feared retaliation from him. Count X alleged defamation per se against Robert Shomaker and alleged that Shomaker wrote a letter to school board member Carolyn Brechon. In the April 10, 2008, letter, Shomaker stated that plaintiff had threatened Shomaker's son that his bad attitude would prevent him from making the varsity team, and he added that many other parents had similar stories about plaintiff's threatening behaviors. Shomaker also e-mailed Brechon on February 29, 2008, and stated that plaintiff's half-time speeches were profanity-laced, that he used profanity during practices as well, and that he called his players "fucking morons."

Count XI alleged defamation per se against Al Knickrehm. Knickrehm was the general manager of NRG Media, which operated AM and FM radio stations in Dixon. The count alleged that Knickrehm made defamatory statements by participating in the petition to the school board to have plaintiff removed. Additionally, Knickrehm invited Michael Venier, Richard Kuecker, and Glen Hughes to appear on the program on his radio station on March 21, 2008. During the program, defamatory statements were made about plaintiff, as summarized in the description of the count against Richard. Knickrehm further allowed the "Save Dixon Sports Committee" to post the radio program on its Web site for repeated publication. On April 16, 2008, Knickrehm told reporter Trowbridge that plaintiff had "absolutely ripped the management of WIXN on its own radio station." Count XII alleged defamation per se against NRG Media, LLC, making the same allegations as count XI.

Plaintiff alleged false light and invasion of privacy, alleging the same conduct described in the defamation counts, in the following counts: count XIII (Michael Venier); count XIV (Richard Kuecker); count XV (Glen Hughes); count XVI (Mary Mahan-Deatherage); count XVII (David Deets); count XVIII (Dan Burke); count XIX (Tim Oliver); count XX (Greg Deatherage); count XXI (Al Knickrehm); count XXII (NRG Media, LLC); and count XXVI (Robert Shomaker).

Count XXIII alleged interference with plaintiff's business expectancy, alleging the same conduct that supported the defamation per se and false light claims.

Count XXIV alleged slander per se against Neil Petersen. Petersen was a school board member who stated in a March 21, 2008, letter to other school board members that the school board's proposed code-of-conduct response to the complaints about plaintiff was a "slap in the face" to parents and that the board's decision to retain plaintiff was jeopardizing funding from local business entities for extracurricular activities. Count XXV alleged against Petersen intentional interference with plaintiff's business expectancy, for the same statements supporting count XXIV.

On April 23, 2008, the school board removed plaintiff as basketball coach, but he was retained as the school's athletic director.

On July 3, 2008, in response to plaintiff's second amended complaint, NRG Media and Knickrehm filed a motion to dismiss pursuant to section 2--615 of the Code of Civil Procedure (Code) 735 ILCS 5/2--615 (West 2008)[1], arguing that the Act barred plaintiff's claims, that the alleged statements were protected opinions, that plaintiff failed to allege facts supporting that any statement was made with actual malice, which was a required element because plaintiff was a public

---

[1] The motion to dismiss was a combined motion under sections 2--615 and 2--619 of the Code, although the motion itself references only section 2--615.

figure, and that plaintiff failed to state all elements of each claim.  On July 7, 2008, Michael Venier filed a similar motion to dismiss.  Also on July 7, Glen Hughes, Tim Oliver, Dan Burke, David Deets, Mary Mahan-Deatherage, and Greg Deatherage filed a similar motion to dismiss.  On July 8, Richard and Ardis Kuecker and Robert Shomaker and Neil Petersen filed similar motions to dismiss.

On August 26, 2008, the trial court heard the motions to dismiss.  After the parties' arguments, the trial court took the matter under advisement.  On November 17, 2008, after a flurry of responses and replies, plaintiff filed a motion for leave to file a third amended complaint, which added count XXVI.  In the meantime, on December 10, 2008, the trial court issued a detailed memorandum opinion and order on the matter.  We summarize the trial court's order now, and we will further explore these issues in our analysis section.

The trial court acknowledged that defendants moved to dismiss under section 2--615 of the Code, attacking the legal sufficiency of the complaint.  However, defendants argued that the complaint should be dismissed for numerous reasons and that the Act provided the most well-founded reason.  In reviewing the Act's history, public policy, intent, and broad-reaching language, the trial court determined that the Act barred plaintiff's complaint.  The trial court stated that the Act applied to any claim based on, related to, or in response to any act or acts of the moving party in furtherance of the moving party's rights to petition, speak, assemble, or otherwise participate in government.  In this case, defendants first sought action at a school board meeting but were unhappy with the result.  Defendants sought to gain support for their position by publicizing their grievances against plaintiff, and their conduct did result in a reconsideration of the school board's initial decision.

The trial court acknowledged that section 15 of the Act appeared ambiguous in that it both excluded inquiry as to the subjective intent or purpose of the acts in furtherance of the moving party's rights and then included inquiry as to the genuine aim of those acts. The trial court determined that the legislature's intent was to adopt the standard in City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991), which adopted the Noerr-Pennington doctrine--derived from Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464 , 81 S. Ct. 523 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965). The gist of this doctrine is that even if a speaker was motivated by an illegal purpose in petitioning the government, as long as the actions constituted a genuine effort at petitioning for government action, they were immune from liability. City of Columbia, 499 U.S. at 380, 113 L. Ed. 2d at 398, 111 S. Ct. at 1354. The only exception, known as the "sham" exception, applies when the speaker's actions were not genuinely aimed at procuring government action. City of Columbia, 499 U.S. at 380, 113 L. Ed. 2d at 398, 111 S. Ct. at 1354. Thus, the trial court concluded that the ambiguity was to be resolved by determining whether the speaker's acts were genuinely aimed at procuring favorable government action and that an inquiry into the subjective intent or malice is not allowed unless the objective test fails. Having determined that defendants here acted in furtherance of their desire that the school board remove plaintiff as coach and athletic director, the trial court held that the Act barred plaintiff's complaint in its entirety. It dismissed all 25 counts of plaintiff's second amended complaint.

On December 29, 2008, plaintiff moved for reconsideration. On January 2, 2009, defendants objected to plaintiff's motion for leave to file a third amended complaint. On March 30, 2009, defendants collectively moved for reasonable attorney fees under section 25 of the Act. On May 15,

2009, the trial court denied plaintiff's motion to reconsider. It also addressed plaintiff's third amended complaint, stating that much of the complaint was identical to the second amended complaint. The only new allegations were contained in counts X and XXVI against Shomaker. Specifically, the amendments addressed alleged defamatory conduct in May or June 2008. The court allowed the third amended complaint to be filed as to counts X and XXVI. Shomaker moved to dismiss both counts on May 18, 2009. On July 23, 2009, the trial court granted Shomaker's motion to dismiss counts X and XXVI on grounds the Act barred plaintiff's action.

On May 18, 2009, Clark, Justen & Zucchi filed an affidavit in support of attorney fees totaling $15,991.28, for work performed on behalf of Venier. Dixon & Giesen filed an affidavit in support of attorney fees totaling $26,295.88, for work performed on behalf of Oliver, Burke, Deets, the Deatherages, Hughes, Shomaker, and Petersen. Pignatelli & Mertes filed an affidavit in support of attorney fees totaling $11,811, for work performed on behalf of the Kueckers. McGuireWoods filed an affidavit in support of attorney fees totaling $212,192.32, for work performed on behalf of NRG Media and Knickrehm. Plaintiff objected to the attorney fees claimed by McGuireWoods, arguing that such fees were unreasonable and unconscionable.

On July 15, 2009, the trial court rendered a decision on attorney fees. The court noted that it had advised the parties that requests for attorney fees should be limited to the portions of the case that dealt with the application of the Act. The parties had spent a substantial amount of time advocating other potential defenses besides the Act, and there was no provision for attorney fees for those defenses. The court further did not accept costs for travel time for attorneys who resided outside Lee County. The trial court noted the disparity in hourly fees, which ranged from $140 per hour to $508 per hour. The court determined that the reasonable hourly rate rested at $200 and that

any fees charged in excess of $200 per hour would not be granted. The court further rejected McGuireWoods' charges for assistants, librarians, and WestLaw, as those were overhead costs; it also rejected McGuireWoods' charges for an attorney who was retained by an insurance company and was not an attorney with McGuireWoods. The court ordered the parties to revise their fee petitions accordingly.

As ordered, counsel for the various defendants filed revised petitions as follows: Pignatelli & Mertes, on behalf of the Kueckers, $1,560; Clark, Justen & Zucchi, on behalf of Venier, $11,229.28; Dixon & Giesen, on behalf of Oliver, Burke, Deets, the Deatherages, Hughes, Shomaker, and Petersen, $8,771.50; and McGuireWoods, on behalf of NRG Media and Knickrehm, $32,940. All attorneys filed motions for reconsideration of the trial court's decision to limit the fees to those incurred preparing the portions of the motions to dismiss based only on the Act.

On September 18, 2009, the trial court issued its final order, stating that it believed $200 per hour was the reasonable hourly rate charged by attorneys in Lee County for this type of legal work. It also believed that section 25 of the Act limited attorney fees to those incurred in connection with the motions based on the Act. Plaintiff did not respond to the revised fee petitions. The court granted the fees contained in the revised petitions.

Plaintiff timely appealed, seeking reversal of the dismissal of his complaint and reversal of the award of attorney fees. Except Venier, defendants all timely filed notices of cross-appeal, seeking expansion of the attorney fee awards to include those fees associated with the entire defense.

II. ANALYSIS

On appeal, plaintiff argues that: (1) the Act deprives him of his constitutional right to remedies for his injuries; (2) the Act is unconstitutional because it violates the due process and equal protection clauses; (3) defendants' conduct was not performed with the genuine aim of procuring favorable government action; and (4) the trial court failed to strike a balance between the rights of persons to file lawsuits and the constitutional rights of persons to petition and participate in the government. Defendants counter that the Act is broad, applicable to the facts of the case at bar, and constitutional, both facially and as applied. Thus, the trial court did not err in applying the Act and dismissing plaintiff's complaint.

At oral argument, the parties acknowledged there was some confusion as to whether the trial court dismissed plaintiff's complaint under section 2--615 of the Code or under the Act. Despite the parties' and the trial court's references to dismissal pursuant to section 2--615, the dismissal was pursuant to the Act. The Act provides a procedure for dismissal similar to section 2--619(a)(9) of the Code (735 ILCS 5/2--619(a)(9) (West 2008)), since it does not attack the legal sufficiency of a claim but rather provides another method to defeat the claim. See 735 ILCS 110/20 (West 2008). A motion to dismiss under section 2--619 admits the legal sufficiency of the plaintiff's complaint but asserts an affirmative defense or other matter that avoids or defeats the plaintiff's claims. River Plaza Homeowner's Ass'n v. Healey, 389 Ill. App. 3d 268, 275 (2009). Likewise, we would consider the facts legally sufficient when considering dismissal under the Act. The Code allows for a combined motion to dismiss with respect to sections 2--615 and 2--619. 735 ILCS 5/2--619.1 (West 2008). "A combined motion, however, shall be in parts. Each part shall be limited to and shall specify that it is made under one of Sections 2--615, 2--619, or 2--1005." 735 ILCS 5/2--619.1 (West 2008). The Code further provides that each part shall clearly show the points or grounds relied upon under

the section upon which it is based. 735 ILCS 5/2--619.1 (West 2008). Accordingly, it follows that a motion under section 2--615 or 2--619 combined with a motion under the Act would be allowed. Although "hybrid" motions are improper, a reviewing court will review the dismissal if doing so would serve the interests of judicial economy and the nonmoving party was not prejudiced. Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A., 286 Ill. App. 3d 48, 63 (1996). Here, although the grounds for defendants' motions were somewhat intertwined, it does not appear that plaintiff was prejudiced, as there was no objection to the manner in which defendants presented their motions and no party raises this issue on appeal. Further, the Act provides a new procedural method for dismissal, and defendants' arguments pertaining to the Act were separated sufficiently to be understood. Therefore, we will review the dismissal pursuant to the Act, using section 2--619 principles as guidelines.

The purpose of a section 2--619 motion is to dispose of issues of law and easily proved issues of fact early in the litigation. Czarobski v. Lata, 227 Ill. 2d 364, 369 (2008). When ruling on a section 2--619 motion, the court must construe the pleadings and supporting documents in the light most favorable to the nonmoving party. Czarobski, 227 Ill. 2d at 369. The court must accept as true all well-pleaded facts in the plaintiff's complaint and all inferences that can reasonably be drawn in the plaintiff's favor. Barber v. American Airlines, Inc., 398 Ill. App. 3d 868, 878 (2010). In ruling on the motion to dismiss, the court may consider pleadings, depositions, and affidavits on record. Barber, 398 Ill. App. 3d at 878. The reviewing court must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent an issue of material fact, whether dismissal was proper as a matter of law. Czarobski, 227 Ill. 2d at 369. Even if the trial

court dismissed on an improper ground, we may affirm the dismissal on any proper basis found in the record. Barber, 398 Ill. App. 3d at 878. Our review is de novo. Czarobski, 227 Ill. 2d at 369.

The Act, which became effective August 28, 2007, is relatively short. Section 5 declares the Act's public policy, which we quote in relevant part:

"[I]t is declared to be the public policy of the State of Illinois that the constitutional rights of citizens and organizations to be involved and participate freely in the process of government must be encouraged and safeguarded with great diligence. ***

Civil actions for money damages have been filed against citizens and organizations of this State as a result of their valid exercise of their constitutional rights to petition, speak freely, associate freely, and otherwise participate in and communicate with government. There has been a disturbing increase in lawsuits termed 'Strategic Lawsuits Against Public Participation' in government or 'SLAPPs' as they are popularly called.

The threat of SLAPPs significantly chills and diminishes citizen participation in government ***. This abuse *** has been used as a means of intimidating, harassing, or punishing citizens *** for involving themselves in public affairs.

It is in the public interest and it is the purpose of this Act to strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government; to protect and encourage public participation in government to the maximum extent permitted by law; to establish an efficient process for identification and adjudication of SLAPPs; and to provide for attorney's fees and costs to the prevailing movants." 735 ILCS 110/5 (West 2008).

Section 15 of the Act provides:

"Applicability. This Act applies to any motion to dispose of a claim in a judicial proceeding on the grounds that the claim is based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.

Acts in furtherance of the constitutional rights to petition, speech, association, and participation in government are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." 735 ILCS 110/15 (West 2008).

Section 20 guides motion practice relating to the Act. Section 20(a) provides that upon the filing of any motion under section 15, "a hearing and decision on the motion must occur within 90 days after notice of the motion is given to the respondent." 735 ILCS 110/20(a) (West 2008). We note that plaintiff, in his motion for reconsideration, argued that the trial court lost jurisdiction to rule upon the motion. That argument was rejected by the trial court because the expedition of the ruling was to benefit defendants, not plaintiff, and because some of the delays were due to plaintiff's filing amended complaints. The parties have not raised this issue on appeal.

Section 20(a) further provides that the "appellate court shall expedite any appeal or other writ, whether interlocutory or not, from a trial court order denying that motion or from a trial court's failure to rule." 735 ILCS 110/20(a) (West 2008). Here, the trial court granted the motion; therefore, we need not address this section. Cf. Mund v. Brown, 393 Ill. App. 3d 994, 998-99 (2009) (holding this provision of section 20(a) in conflict with supreme court rules regarding interlocutory jurisdiction and unenforceable).

Section 20(c) provides that the "court shall grant the motion and dismiss the judicial claim unless the court finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability by this Act." 735 ILCS 110/20(c) (West 2008). Section 20(c), therefore, shifts the moving party's normal burden, to show that an affirmative defense bars the plaintiff's claims, to the nonmoving party, who must show that the Act does not apply. See Kedzie & 103rd Currency Exchange v. Hodge, 156 Ill. 2d 112, 116 (1993) (the defendant has the burden of proving the affirmative defense in a section 2--619 motion to dismiss). However, even when the defendant has the burden to prove that an affirmative defense applies, the burden then shifts to the plaintiff to show that the defense is unfounded or requires the resolution of an issue of material fact before it is proven.

## A. Overview of Defamation Law

Before progressing, we briefly discuss the general principles of defamation law, as the Act changes the common-law rules of defamation by protecting otherwise defamatory speech when made while exercising one's right to petition government. A statement is defamatory if it tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person. Tuite v. Corbitt, 224 Ill. 2d 490, 501 (2006). Statements may be considered defamatory per se or per quod. Tuite, 224 Ill. 2d at 501. A statement is defamatory per se if its defamatory character is obvious and apparent on its face and injury to the plaintiff's reputation may be presumed. Tuite, 224 Ill. 2d at 501. Plaintiff here alleged only defamation per se. There are five categories of per se defamatory statements: (1) statements imputing the commission of a crime; (2) statements imputing infection with a loathsome

communicable disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of ability or otherwise prejudicing a person in his or her profession or business; and (5) statements imputing adultery or fornication. Tuite, 224 Ill. 2d at 501.

Several situations may render otherwise per se defamatory statements not actionable. For instance, a defendant is not liable for a defamatory statement if the statement is true; only substantial truth is required for this defense to apply. J. Maki Construction Co. v. Chicago Regional Council of Carpenters, 379 Ill. App. 3d 189, 203 (2008). A per se defamatory statement is not actionable if it is reasonably capable of an innocent construction. Solaia Technology, LLC v. Specialty Publishing Co., 221 Ill. 2d 558, 580 (2006). Likewise, if the per se defamatory statement constitutes an expression of an opinion, it may enjoy constitutional protection under the first amendment. Solaia, 221 Ill. 2d at 581. There are limitations, however, even when a statement implicates first amendment protection. Couching a factual assertion as an opinion will not free it from a defamation claim. J. Maki, 379 Ill. App. 3d at 200. Other limitations are also implicated when the first amendment is triggered in certain situations. See Gertz v. Welch, 418 U.S. 323, 342-43, 41 L. Ed. 2d 789, 807, 94 S. Ct. 2997, 3008-09 (1974) (public figures may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or reckless disregard for truth or with "actual malice," whereas private individuals do not need to show actual malice and are held to the less-stringent negligence standard (see also Troman v. Wood, 62 Ill. 2d 184, 194-198 (1976))).

Certain privileges may also make per se defamatory statements not actionable. Two classes of privileges exist: absolute privilege and conditional or qualified privilege. Solaia, 221 Ill. 2d at

585. The fair report privilege, which protects statements published about statements made in official court proceedings, is an absolute privilege. Solaia, 221 Ill. 2d at 588. Statements made by legislators or private citizens during legislative proceedings are absolutely privileged (Krueger v. Lewis, 359 Ill. App. 3d 515, 521-22 (2005)), as are statements made during the course of judicial or quasi-judicial proceedings, when the statements are related to the proceedings (Bushell v. Caterpillar, Inc., 291 Ill. App. 3d 559, 561-64 (1997)). An absolute privilege provides a complete bar to a defamation claim, regardless of the defendant's motive or the unreasonableness of the conduct. Naleway v. Agnich, 386 Ill. App. 3d 635, 639 (2008). "A qualified privilege protects communications that would normally be defamatory and actionable, in order to effect the policy of protecting honest communications of misinformation in certain favored circumstances and thus facilitate the availability of correct information." Naleway, 386 Ill. App. 3d at 639. A qualified privilege, however, may be exceeded and the privilege is defeated in circumstances where the defendant makes false statements with an intent to injure or with reckless disregard for the truth. Naleway, 386 Ill. App. 3d at 639. Three types of situations in which a conditional or qualified privilege exists are: (1) situations that involve some interest of the person who publishes the defamatory matter; (2) situations that involve some interest of the person to whom the matter is published or of some third person; and (3) situations that involve a recognized interest of the public. Myers v. Levy, 348 Ill. App. 3d 906, 914 (2004).

Plaintiff also alleged several false light claims. A false light claim must allege that: (1) the defendant's actions placed the plaintiff in a false light before the public; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, that is, with

knowledge of the falsity of the statement or with a reckless disregard for whether the statement was true or false. Duncan v. Peterson, 359 Ill. App. 3d 1034, 1047 (2005).

With this framework of defamation law in mind, the Act alters existing defamation law by providing a new, qualified privilege for any defamatory statements communicated in furtherance of one's right to petition, speak, assemble, or otherwise participate in government. The privilege is qualified because it may be exceeded if the statements are not made with the genuine aim at procuring a favorable government action. With this understanding of the Act, we proceed to consider plaintiff's claim that the Act is unconstitutional and, alternatively, that it does not apply to the facts of this case.

### B. Constitutionality of the Act

Plaintiff first attacks the Act's constitutionality in two different ways: (1) it violates his right to a remedy for his injuries; and (2) it violates the due process and equal protection clauses of the Illinois and United States Constitutions.

Article I, section 12, of the Illinois Constitution provides:

"Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." Ill. Const. 1970, art. I, §12.

Plaintiff argues, albeit briefly and unsupported by case law, that the Act provides blanket immunity, allowing violations of his right to privacy and allowing persistent per se defamatory statements to be made about him with no remedy for the damage to his reputation. We reject plaintiff's argument. Article I, section 12, has been held to represent an expression of philosophy rather than a mandate for a certain remedy in any specific form. Defend v. Lascelles, 149 Ill. App. 3d 630, 642 (1986).

The Defend court acknowledged that persons defamed in judicial proceedings have been left without redress because of the public policy favoring the free and open administration of justice, and it cited to Nolin v. Nolin, 68 Ill. App. 2d 54 (1966), for support that article I, section 12, has never been interpreted to abolish immunities extended for the protection of a recognized public interest. Defend, 149 Ill. App. 3d at 642-43. Other privileges or immunities have been determined not to violate section 12 of article I, as well. See Michigan Avenue National Bank v. County of Cook, 191 Ill. 2d 493, 519-20 (2000) (holding Tort Immunity Act did not violate constitutional right to remedy); Steffa v. Stanley, 39 Ill. App. 3d 915 (1976) (finding spousal immunity did not violate constitutional right to remedy). The legislature has the inherent power to repeal or change the common law and may do away with all or part of it. Michigan Avenue, 191 Ill. 2d at 519. Here, the legislature specifically stated that the purpose of the Act was to protect the rights of citizens to participate freely in government and government processes. Contrary to plaintiff's characterization that the Act provides "blanket immunity" for persons to defame others, the Act provides protection for such statements only when made "in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." 735 ILCS 110/15 (West 2008). The Act provides a qualified privilege, granting more protection for speech than the common law provides, when the speech occurs in the exercise of the right to participate in government. Thus, the legislature's enactment of the Act cannot be said to violate section 12 of article I of the Illinois Constitution.

Next, plaintiff argues that the Act deprived him of his due process and equal protection rights under both the Illinois and United States Constitutions. He argues that the Act creates a separate classification of persons--public employees--who, unlike others outside that class, are deprived of

remedies for personal injuries. The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner. Jacobson v. Department of Public Aid, 171 Ill. 2d 314, 322 (1996). While the State is not precluded from enacting legislation that draws distinctions between different categories of people, the State is prohibited from according different treatment to persons who have been placed in different categories on the basis of criteria wholly unrelated to the purpose of the legislation. Jacobson, 171 Ill. 2d at 322. In reviewing a claim that a statute violates equal protection, the court applies different levels of scrutiny, depending on the nature of the statutory classification involved. Jacobson, 171 Ill. 2d at 322-23. Classifications based on race or national origin or affecting fundamental rights are strictly scrutinized. Jacobson, 171 Ill. 2d at 323. Intermediate scrutiny applies to discriminatory classifications based on sex or illegitimacy. Jacobson, 171 Ill. 2d at 323. In all other cases, the court employs only a rational basis review. Jacobson, 171 Ill. 2d at 323.

In this case, plaintiff argues that the Act unequally affects public employees, which would trigger rational basis review. However, in reading the plain language of the statute, we cannot agree that the Act places public employees in a special category at all. The Act applies to any moving party whose alleged acts were in furtherance of the moving party's rights to petition, speak, assemble, or otherwise participate in government. Plaintiff himself, a government employee, may use the Act as a shield if he were facing a similar lawsuit for his participation in a government process. We reject plaintiff's allusion that Jarrow Formulas, Inc. v. LaMarche, 31 Cal. 4th 728, 74 P.3d 737, 3 Cal. Rptr. 3d 636 (2003), somehow supports his position that anti-SLAPP statutes are misused in protecting tortious misconduct. Jarrow merely held that a malicious prosecution claim, while covered by California's anti-SLAPP statute, was properly dismissed under the statute because the

plaintiff failed to prove that it had a probability of prevailing on the claim. Jarrow, 31 Cal. 4th at 742-44, 74 P.3d at 746-47, 3 Cal. Rptr. 3d at 646-48. Further, California's statute is much less broad than the Act and thus its case law, while perhaps instructive, is not persuasive. See Cal. Civ. Proc. Code §425.16 (West 2010). Therefore, we reject plaintiff's equal protection argument because the Act applies to all citizens meeting the criteria for its application. It is true that if plaintiff were employed by a private school, the Act likely would not apply because his removal would not involve a government process or achieving a government result, but that is because the intention of the statute is to protect citizens' constitutional rights to participate in government, not to get involved in privately operated businesses.

At oral argument and in his reply brief, plaintiff rejected defendants' claim that the Act is constitutional because remedies have been removed by other statutes that provide absolute or qualified privileges, such as judicial proceedings privileges or those provided by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1--101 et seq. (West 2006)). Plaintiff raised Myers and McDonald v. Smith, 472 U.S. 479, 86 L. Ed. 2d 384, 105 S. Ct. 2787 (1985), in support. These cases raise an interesting issue that plaintiff failed to raise in his opening brief. The facts of Myers are strikingly similar to the facts of this case. In Myers, a parent made public statements against a high school football coach, seeking his removal. Myers, 348 Ill. App. 3d at 910. The coach filed a defamation lawsuit; the defendant moved for summary judgment; and the trial court granted summary judgment on the basis that the statements were privileged because they were directed toward the school, a governmental body. Myers, 348 Ill. App. 3d at 912. The trial court further concluded that the defendant did not act with actual malice, because he genuinely believed the veracity of his statements, including statements about the coach's

performance. Myers, 348 Ill. App. 3d at 912-13. The plaintiff appealed, and the defendant argued that summary judgment was appropriate under the Noerr-Pennington doctrine. This court disagreed, stating that the Noerr-Pennington doctrine did not apply in the context of defamation claims. Myers, 348 Ill. App. 3d at 918. Instead, this court applied McDonald and declined to elevate the right to petition to an absolute immunity for defamatory statements. Myers, 348 Ill. App. 3d at 919.

In McDonald, the plaintiff sued the defendant for sending libelous letters to President Reagan with the intention that he not hire the plaintiff for a United States Attorney position. McDonald, 472 U.S. at 480, 86 L. Ed. 2d at 387, 105 S. Ct. at 2789. The defendant moved for a judgment on the pleadings, arguing that the petition clause of the first amendment provided absolute immunity for his statements. McDonald, 472 U.S. at 481, 86 L. Ed. 2d at 387, 105 S. Ct. at 2789. The Supreme Court disagreed, stating that it was not prepared to conclude that "the Framers of the First Amendment understood the right to petition to include an unqualified right to express damaging falsehoods in exercise of that right." McDonald, 472 U.S. at 484, 86 L. Ed. 2d at 389, 105 S. Ct. at 2790. The Supreme Court further stated that "[t]o accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status," despite the fact that the petition clause was "inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble." McDonald, 472 U.S. at 485, 86 L. Ed. 2d at 390, 105 S. Ct. at 2791. The Supreme Court found "no sound basis for granting greater constitutional protection to statements made in a petition" than other first amendment expressions, stating that "the right to petition is guaranteed; the right to commit libel with impunity is not." McDonald, 472 U.S. at 485, 86 L. Ed. 2d at 390, 105 S. Ct. at 2791.

Prior to Myers, the Noerr-Pennington doctrine was extended to civil claims outside the antitrust arena. King v. Levin, 184 Ill. App. 3d 557, 560 (1989). The Illinois Supreme Court addressed the extent to which acts petitioning a legislative body were privileged, in Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Ass'n, 37 Ill. 2d 546 (1967), where, in the context of a zoning ordinance situation, it determined that the right to petition was not absolute and that wrongful conduct by a person who had "actual malice" was not protected by the privilege. Arlington Heights, 37 Ill. 2d at 551; King, 184 Ill. App. 3d at 560 (applying Arlington Heights standard in real estate development situation). However, the doctrine has not been applied in the context of defamation.

After Myers, the legislature acted, intentionally or unintentionally, to extend the Noerr-Pennington doctrine beyond the arena of antitrust or zoning litigation. Under the Act, the right to petition government is guaranteed and in so petitioning, one also has the right to commit libel with impunity, as long as he does so with the genuine aim of procuring government action. As stated, the legislature has the inherent power to repeal or change the common law and provide privileges or immunities that affect a plaintiff's right to a remedy. Here, in protecting the rights of citizens to participate in government, the legislature provided a qualified privilege to speak even with actual malice. While this court may agree with plaintiff that the Act is broad, changing the landscape of defamation law, it is not this court's role to rewrite the statute. That is the duty of the legislature. See DeSmet v. County of Rock Island, Illinois, 219 Ill. 2d 497, 510 (2006) ("This court may not legislate, rewrite or extend legislation. If a statute, as enacted, seems to operate in certain cases unjustly or inappropriately, the appeal must be to the General Assembly, and not to this court"). Plaintiff has not provided us with a valid argument to strike down the Act on constitutional grounds.

To the extent plaintiff alludes to grounds that the Act is unconstitutional other than those discussed here, we find those arguments forfeited for lack of development and citation to legal support. See 210 Ill. 2d R. 341(h)(7); Bohne v. La Salle National Bank, 399 Ill. App. 3d 485, 513 (2010). Having determined that plaintiff's constitutional attacks fail, we next consider the Act's applicability to plaintiff's complaint.

## C. Applicability of the Act

Plaintiff's last two arguments involve the applicability of the Act to the facts of this case. Plaintiff argues that the trial court erred in determining that the Act protected defendants' statements made outside the actual petition to the school board. Further, the trial court failed to strike a balance between plaintiff's right to file a lawsuit and defendants' right to participate in government. Defendants argue that the Act was written broadly enough that it applies to their statements made outside the petition and the school board meeting and that the trial court did not have the authority to give more weight to plaintiff's right to file a lawsuit. We agree with defendants.

Considering plaintiff's arguments in turn, we are required to interpret the Act, using general rules of statutory construction. The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. Abruzzo v. City of Park Ridge, 231 Ill. 2d 324, 332 (2008). The best indication of the legislature's intent is the statutory language, given its plain and ordinary meaning. Abruzzo, 231 Ill. 2d at 332. When the language of the statute is clear and unambiguous, it must be applied without resorting to aids of construction. Abruzzo, 231 Ill. 2d at 332. In determining intent, we consider the statute in its entirety, and words and phrases are not to be read in isolation. Abruzzo, 231 Ill. 2d at 332-33. A statute is ambiguous when it is capable of being understood in two or more different senses by reasonably well-informed persons. Ready v.

United/Goedecke Services, Inc., 232 Ill. 2d 369, 377 (2008). When a statute is ambiguous, the court may use tools of interpretation to ascertain the meaning of a provision. Ready, 232 Ill. 2d at 379-80.

According to the plain language of the Act, the privilege will apply where: (1) the defendant's acts were in furtherance of his rights to petition, speak, associate, or otherwise participate in government to obtain favorable government action; (2) the plaintiff's claim is based on, related to, or in response to the defendant's "acts in furtherance"; and (3) the plaintiff fails to produce clear and convincing evidence that the defendant's acts were not genuinely aimed at procuring favorable government action. As defendants argue, the plain language of the Act provides that the Act "shall be construed liberally to effectuate its purposes and intent fully." 735 ILCS 110/30(b) (West 2008). Section 5 of the Act sets forth its purpose and intent in significant depth.

As to the "acts in furtherance" portion of the Act, plaintiff argues that the Act should be read to cover only acts performed during a government proceeding. Acts or statements made during legislative, judicial, or quasi-judicial proceedings are already protected by absolute or qualified privileges, including the protection of the right to petition the government as established by the Noerr-Pennington doctrine. See King, 184 Ill. App. 3d at 559 (identifying the qualified privilege outlined by the Noerr-Pennington doctrine for persons engaged in activities designed to influence government action). Considering the general statutory construction rules, and the Act's plain language, we cannot agree with plaintiff that the Act applies only to acts made during a government proceeding. The Act states that it applies to "any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." (Emphasis added.) 735 ILCS 110/15 (West 2008).

Regarding the latter portion of section 15, the trial court concluded that the language providing that "[a]cts in furtherance ***are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome" was ambiguous. It then concluded, based on the legislative history of the Act, that the legislature intended to adopt the Noerr-Pennington doctrine, which includes the "sham" exception for acts performed without a genuine aim at procuring government action. We agree that this clause is ambiguous. While this section removes any consideration of intent or purpose, it then requires the court to consider intent as to whether the acts were made with the genuine aim of procuring government action. The directive on intent is unclear as to whether the court should consider the intent of the defendant's acts on a subjective or an objective basis. Because we deem this section ambiguous on its face, we resort to statutory construction aids to determine whether to use a subjective or an objective basis in deciding whether the acts were genuinely aimed at procuring government action.

We first look to the legislative history of the Act. There was not much discussion when the Act was passed, despite attempts at getting anti-SLAPP statutes passed in previous years (see E. Madiar & T. Sheehan, Illinois' New Anti-SLAPP Statute, 96 Ill. B.J. 620 (December 2008)). The Act was sponsored by Senator John Cullerton. Senator Cullerton stated the following about the Act before the Senate voted to pass the bill:

"This bill is in response to a threat of what's called Strategic Lawsuits Against Public Policy [sic] (Participation). It's referred to as a SLAPP, legislation that a number of other states have--have passed. And what it's about is to--address the concern that certain lawsuits that could be filed that significantly would chill and diminish citizen participation in government

or voluntary public service or the exercise of those constitutional rights. So, what the bill does is to first declare the public policy that we want to encourage, obviously, our citizens to--their constitutional rights--to exercise their constitutional rights of free speech and the right to petition and redress grievances. And then it provides for a procedural protection, if you will, when they are sued. And I'll give you an example, let's say a community organization makes recommendations to a local alderman concerning zoning changes. They just give advice, then the party that might not agree with the decision, the vote of the alderman, they--that person, that landowner would file a lawsuit, not just against the municipality, but also against the community organization that gave the advice. Even though all they were doing was giving advice to their elected officials. So, that's what the purpose of the bill is. We worked out an--an agreement with the--the trial lawyers so they are no--no longer in opposition. Municipal League is in favor." 95th Ill. Gen. Assem., Senate Proceedings, April 20, 2007, at 15-16 (statements of Senator Cullerton).

Likewise, in the House, there was little debate. Representative Jack Franks made the following comments before the bill passed in the House:

"This Bill has been around for awhile. Now, Representative Feigenholtz worked on it awhile ago, Senator Obama had it as well had Senator Dillard. This year we were fortunate in that we got the parties together and there's no longer any opposition. The ACLU, the Illinois Municipal League and ITLA have...are all proponents. And what this Bill does is it codifies the standard in a 1991 U.S. Supreme Court case, the City of Columbia v. Omni Outdoor Advertising when dealing with citizens participation lawsuits. And the reason why we're putting this Bill forward is that oftentimes folks who speak out whether they're running for

office or are in office are sued by people to try to get them to shut up, to try to chill their ability to speak and it's wrong and it's not what we're about. And this Bill would take away many of those abuses that we'd see. I can tell you in my county, it'd be in the Village of Richmond, there was two (2) gentlemen running for trustees who were...who won but they were sued by a developer, threatened with bankruptcy, not being able to pay their legal fees, even though the...the developer's lawsuit was thrown out on three (3) separate occasions and that would stop the type of abuse. I'd be glad to answer any questions.

* * *

Black: Representative, Representative Sacia brought a Bill up a few days ago where a constituent had to pay seven thousand dollars ($7,000) to get out of being named a defendant in a lawsuit because he went to a hearing and signed in...

Franks: Right.

Black: ...in as an opponent and I don't recall what the project or the issue was in Representative Sacia's district. But anyway, I mentioned at the time these slap lawsuits are often used to inhibit our participation. So, the bottom line is this Bill would then make it easier for someone who is hit with one of those suits to seek immediate relief and there'd be...not name the defendant and so not to chill public participation and expression when you want to speak out against something that's going on in your district, correct?

Franks: Absolutely.

Black: All right. Great.

Franks: *** It's an expedited hearing that they have to do within ninety (90) days and it also shifts the burden on the plaintiff and should the plaintiff lose, they'd have to pay the defendant's attorneys fees.

* * *

Feigenholtz: I, too, rise in support of this legislation. It is a remedy to an issue that also occurred in my legislative district a few years ago. *** I believe that we really need to begin to put in these safeguards for people who speak out in pub...in public forums and are endangered by people who don't appreciate the First Amendment very much. ***

* * *

Mathias: So, Representative Franks, I just want to make sure I got this right. You're trying to make sure that people are not shut up at...

Franks: Right.

Mathias: ...at board meetings and places like that. Is that correct?

Franks: Or whether they're running for office, as well.

Mathias: Right.

Franks: Because what happened like in our area, in Richmond, these folks who were running for office were not included in the insurance that the village had and the mayor wouldn't include them.

Mathias: And so, you're doing it by shutting up the people who are trying to shut them up. Is that correct?

Franks: I'm not...I'm not sure I understand the question. No, I'm not saying...

Mathias: And you're trying to shut up the people who are doing the lawsuits, right?

Franks: What I'm trying...I'm trying to bring some sanity to it..

Mathias: Okay.

Franks: ...and if they want to fi...Anybody can file a lawsuit.

Mathias: Yes.

Franks: Anybody with a pen can file a lawsuit.

Mathias: Representative, I'm supporting your legislation

Franks: Good, good.

Speaker Hannig: Any further discussion? Representative Franks to close.

Franks: I appreciate the folks who spoke on this. And let's join the twenty-two (22) other states that have this type of legislation, so we can keep the process going and not stifle public discussion and not put a chilling effect on people who want to speak their minds." 95th Ill. Gen. Assem., House Proceedings, May 31, 2007, at 58-61 (statements of Representatives Franks, Black, and Mathias).

Based on Representative Franks' reference to City of Columbia, we agree with the trial court that the legislature intended to adopt the Noerr-Pennington doctrine. However, that doctrine is more complicated than the legislative debates and the Act itself provide. The Noerr-Pennington doctrine originated in the antitrust arena, presenting a limit on antitrust liability by protecting companies' lobbying efforts, which stem from first amendment guarantees of free speech and freedom to petition

the government. D. Davis, The Fraud Exception to the Noerr-Pennington Doctrine in Judicial and Administrative Proceedings, 69 U. Chi. L. Rev. 325, 328 (Winter 2002). The Noerr case involved a group of truckers who sued several railroad companies, alleging that they violated the Sherman Act by engaging in a negative publicity campaign against the trucking industry in an effort to damage the industry. Noerr, 365 U.S. at 129, 5 L. Ed. 2d at 466, 81 S. Ct. at 525. The railroads admitted conducting the campaign in an effort to influence the passage of certain state laws affecting truck weight limits and tax rates. The Supreme Court found in favor of the railroads, finding that the Sherman Act did not regulate political activity and would otherwise infringe on the railroads' right to petition government. Noerr, 365 U.S. at 144, 5 L. Ed. 2d at 475, 81 S. Ct. at 533. The Noerr Court limited its holding, stating that there may be situations where conduct is a "mere sham" to cover what is actually an attempt to interfere with business relationships of a competitor, implicating the Sherman Act. Noerr, 365 U.S. at 144, 5 L. Ed. 2d at 475, 81 S. Ct. at 533. Pennington upheld the same antitrust immunity doctrine where coal companies and unions persuaded the Labor Department to establish minimum wages for employees of contractors, which frustrated the non-unionized companies' efforts to compete. Pennington, 381 U.S. at 660, 14 L. Ed. 2d at 630-31, 85 S. Ct. at 1588. The antitrust immunity was expanded to protect administrative proceedings in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11, 30 L. Ed. 2d 642, 646, 92 S. Ct. 609, 611-12 (1972), where a group of highway carriers alleged a conspiracy by other carriers to bring state and federal proceedings before courts or agencies to prevent them from receiving operating rights.

The "sham exception" to the Noerr-Pennington protection was mentioned in Noerr and was discussed in greater detail in City of Columbia, which Representative Franks referenced during the

legislative hearings. In City of Columbia, Omni, filed an antitrust lawsuit against Columbia Advertising, after Columbia had petitioned the government to enact billboard zoning limitations that hampered Omni's ability to compete with it. City of Columbia, 499 U.S. at 367-68, 113 L. Ed. 2d at 390, 111 S. Ct. at 1347. The Supreme Court stated that the sham exception encompassed situations in which "persons use the governmental process--as opposed to the outcome of the process--as an anticompetitive weapon." (Emphasis in original.) City of Columbia, 499 U.S. at 380, 113 L. Ed. 2d at 398, 111 S. Ct. at 1354. The Court defined a sham situation as one involving a defendant whose activities are " 'not genuinely aimed at procuring favorable government action,' " and not one who simply uses improper means to achieve the desired governmental result. City of Columbia, 499 U.S. at 380, 113 L. Ed. 2d at 398, 111 S. Ct. at 1354, quoting Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500 n.4, 100 L. Ed. 2d 497, 505 n.4, 108 S. Ct. 1931, 1937 n.4 (1988). The Court concluded that while Columbia had "indisputably set out to disrupt Omni's business relationships, it sought to do so not through the very process of lobbying, or of causing the city council to consider zoning measures, but rather through the ultimate product of that lobbying and consideration, viz., the zoning ordinances." (Emphasis in original.) City of Columbia, 499 U.S. at 381, 113 L. Ed. 2d at 398, 111 S. Ct. at 1354.

The Supreme Court, however, further explained the sham exception approximately one year after City of Columbia, in Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60-61, 123 L. Ed. 2d 611, 623-24, 113 S. Ct. 1920, 1928 (1993), in which it announced a two-part test for the exception to apply. In Professional Real Estate, Columbia Pictures sued Professional Real Estate Investors (PRE) for an alleged copyright infringement; PRE countersued, charging Columbia with antitrust violations and alleging that its copyright action was

a mere sham that "cloaked underlying acts of monopolization and conspiracy to restrain trade." Professional Real Estate Investors, 508 U.S. at 52, 123 L. Ed. 2d at 618, 113 S. Ct. at 1924. Columbia argued that filing the copyright lawsuit was immune under Noerr. The Supreme Court, after a discussion about the confusion in determining a sham, set forth the two-part test:

> "First, [Columbia's] lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor' [citation] through the 'use [of] the governmental process--as opposed to the outcome of that process--as an anticompetitive weapon.' " (Emphasis in original.) Professional Real Estate, 508 U.S. at 60-61, 123 L. Ed. 2d at 624, 113 S. Ct. at 1928, quoting City of Columbia, 499 U. S. at 380, 113 L. Ed. 2d at 398, 111 S. Ct. at 1354.

Thus, the Court explained that this two-part test for the sham exception requires a plaintiff to disprove a challenged lawsuit's legal viability (objective motivation) before a court would entertain evidence of the economic viability (subjective motivation), and if that plaintiff succeeds, he still has to prove his antitrust claim. Professional Real Estate, 508 U.S. at 61, 123 L. Ed. 2d at 624, 113 S. Ct. at 1928. Proving a sham "merely deprives the defendant of immunity." Professional Real Estate, 508 U.S. at 61, 123 L. Ed. 2d at 624, 113 S. Ct. at 1928. The Court went on to explain

that confusion over determining whether the sham exception applied stemmed from the Court's previous use of the word "genuine" to denote the opposite of "sham." Professional Real Estate, 508 U.S. at 61, 123 L. Ed. 2d at 624, 113 S. Ct. at 1928. The Court stated that "genuine" had both subjective and objective connotations, defining the word as meaning (1) " 'actually having the reputed or apparent qualities or character'; and (2) 'sincerely and honestly felt or experienced.' " Professional Real Estate, 508 U.S. at 61, 123 L. Ed. 2d at 624, 113 S. Ct. at 1929, quoting Webster's Third New International Dictionary 948 (1986). Thus, to be a sham, "litigation must fail to be 'genuine' in both senses of the word." Professional Real Estate, 508 U.S. at 61, 123 L. Ed. 2d at 624-25, 113 S. Ct. at 1929.

Turning to the Act, if the legislature's intent was to adopt the standards set forth in City of Columbia, then the Act is adopting the two-part analysis employed to determine whether the party's acts in furtherance were "genuinely aimed at procuring favorable government action." The words of the Act in section 15, although ambiguously written, correspond with the Supreme Court's analysis. Subjective intent is considered only when one's conduct is not genuinely aimed at procuring favorable government action. Applying the doctrine and its sham exception to the facts of this case requires the court to first consider whether objective persons could have reasonably expected to procure a favorable government outcome (plaintiff's removal) through a public campaign like defendants' campaign against plaintiff. If the answer to that question is "yes," then the court need not consider the subjective intent of defendants' conduct. If the answer is "no," then the court would consider whether defendants' subjective intent was not to achieve a government outcome that may interfere with plaintiff but rather to interfere with plaintiff by using the governmental process itself.

Here, defendants' acts did, in fact, lead to their desired outcome that the school board remove plaintiff as coach of the basketball team. Regardless of the actual outcome, even plaintiff admitted that defendants continued to seek his removal after the school board denied their petition. In plaintiff's own words in his complaint, the statements alleged all surrounded defendants' "campaign to have [plaintiff] removed as basketball coach and athletic director due [to] their disagreement with his coaching style." Defendants first complained to the Dixon High School principal, the superintendent, and members of the school board. After a school board meeting that did not end in a favorable result for defendants, defendants sought to gain more support through a Web site and speaking publicly. This is part of the process of influencing the government to make a decision in a petitioner's favor. Defendants had a right to participate in this process. The statements alleged in plaintiff's complaint criticized plaintiff's coaching style and related to the need for plaintiff to be removed from his positions. NRG and Knickrehm participated in this process by providing a forum for defendants to speak about their position.[2] Some of the statements made were in the form of letters or comments posted on Web sites. Plaintiff argues that because the school board already heard defendants' complaints once, defendants' ensuing campaign was malicious and not intended at obtaining a favorable government outcome. Plaintiff ignores the possibility that the school board could hear defendants' complaints more than once and change its mind. Plaintiff also ignores the reality that oftentimes governmental bodies react to increasing numbers or public pressure. Here, the trial court determined on an objective basis, and we agree using the same objective standard, that

_____

[2] Plaintiff argues at one point that NRG and Knickrehm have no protection because they are members of the media. However, the Act does not exclude media defendants from its protection.

reasonable persons could expect the school board to change its initial decision after the campaign placed public pressure on the board.

Whether a school board decision is a "government process" is answered by the plain language of the Act. That defendants sought the removal of plaintiff as athletic director and coach of the Dixon basketball team is undisputed. Dixon High School was a public school, and plaintiff was a public high school employee. The Act defines "government" as "a branch, department, agency, instrumentality, official, employee, agent, or other person acting under color of law of the United States, a state, a subdivision of a state, or another public authority including the electorate." 735 ILCS 110/10 (West 2008). Defendants sought action by the school board, and the school board acts under the authority granted to it by the laws of the state. See 105 ILCS 5/10 et seq. (West 2008). Further, a federal court has previously deemed a campaign to remove a school principal as "classic political speech," as "it is direct involvement in governance." Stevens v. Tillman, 855 F.2d 394, 403 (7th Cir. 1988). Therefore, with regard to the first, objective test, plaintiff did not disprove that objective persons in defendants' position could reasonably believe that they could succeed in achieving their desired government outcome. Because the objective test was answered in the positive, we need not consider the defendants' subjective intent. As the Act states, defendants are "immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action." 735 ILCS 110/15 (West 2008). "Intent or purpose" is not considered unless a reasonable person could not expect a favorable government outcome. Thus, we agree with the trial court that defendants acted in furtherance of their rights to participate in government with the goal to obtain favorable government action.[3]

---

[3]We need not address plaintiff's argument that the trial court misapplied Scheidler v.

The Act next requires that plaintiff's claim must be based on, related to, or in response to defendants' acts in furtherance of their rights to petition, speak, assemble, or otherwise participate in government. It is undisputed that plaintiff's lawsuit was based on or in response to defendants' "acts in furtherance."

Finally, the Act mandates dismissal of plaintiff's complaint if plaintiff failed to produce clear and convincing evidence that the defendants' acts were not genuinely aimed at procuring favorable government action. Plaintiff argues only that the Act should not apply because defendants' statements at issue were not made directly to the Dixon school board or during any hearing or governmental proceeding. As discussed, the statements did not need to be made within a petition or during a hearing, but needed only to be made within defendants' participation in the government process, which includes acts of gaining public support to influence favorable government action. Also, as we discussed, plaintiff failed to disprove the objective test--that reasonable persons could expect a favorable government outcome.

Plaintiff briefly argues that there is nothing in the Act eliminating his common-law causes of action. A plain reading of the Act provides that it applies to any motion to dispose of a "claim in a judicial proceeding" and that the Act defines "judicial claim" or "claim" to include "any lawsuit,

---

Trombley, No. 07--L--513 (September 2, 2008), and Shoreline Towers Condominium Association v. Gassman, No. 07--CH--6273 (March 25, 2008), as those circuit court orders were not binding on the trial court and are not binding on this court. Further, those cases are factually distinguishable: cause No. 07--L--513, Scheidler, did not involve statements other than a direct statement to a governmental body; and cause No. 07--CH--06273, Shoreline, applied the Act except as to statements that were clearly unrelated to the defendant's government participation.

cause of action, claim, cross-claim, counterclaim, or other judicial pleading or filing alleging injury." 735 ILCS 110/10 (West 2008). Thus, the Act plainly applies to plaintiff's complaint, which set out causes of action that alleged injury.

Next, plaintiff argues that the trial court failed to strike a balance, as section 5 of the Act requires, between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak, assemble, or otherwise participate in government. We disagree with plaintiff. The public policy in section 5 states that the purpose of the Act is to "strike a balance" between these competing interests, but section 20 mandates dismissal when its requirements are met. The trial court struck the intended balance by properly applying the provisions of the Act. The legislature presumably struck the balance by passing the Act itself, and it is not the court's role to rewrite a statute that appears to lead to unjust results when interpreted as written. See DeSmet, 219 Ill. 2d at 510. As defendant Venier argues in his brief, the legislature often strikes balances between competing interests when enacting statutes, such as the Tort Immunity Act's balancing of the government's need to provide necessary services to the public and an injured citizen's need to seek redress for injuries sustained as a result of such services. The courts, however, are bound to interpret statutes as written and not to strike balances that the legislature already struck.

## D. Attorney Fees

Defendants, with the exception of defendant Venier, cross-appealed the trial court's decision limiting the attorney fees awarded. As stated earlier, the trial court awarded attorney fees per section 25 of the Act (735 ILCS 110/25 (West 2008)), limiting the fees to those incurred preparing the portions of the motions to dismiss based on the Act. Defendants argue that they should have been able to collect fees associated with the defense of the case from the filing of the complaint through

the dismissal. A party may be awarded attorney fees only when the fees are specifically allowed by statute or by a contract between the parties. Grate v. Grzetich, 373 Ill. App. 3d 228, 231 (2007). When a court with proper statutory authority to award attorney fees exercises that authority, we review its decision under an abuse-of-discretion standard. Grate, 373 Ill. App. 3d at 231. Whether a court has the authority to grant attorney fees is a question of law that we review de novo. Grate, 373 Ill. App. 3d at 231.

Section 25 of the Act provides that the "court shall award a moving party who prevails in a motion under this Act reasonable attorney's fees and costs incurred in connection with the motion." 735 ILCS 110/25 (West 2008). Because the parties' dispute involves the interpretation of this statutory provision, we review de novo whether the Act's language encompasses a broader range of attorney fees than the trial court awarded. We review the reasonableness of the amount of fees under an abuse-of-discretion standard.

Plaintiff conceded during trial court proceedings that section 25 mandated that the trial court grant attorney fees for defendants. The parties dispute what fees are covered by section 25. NRG and Knickrehm argue that the unambiguous, plain language of the Act provides that fees for all of their attorneys' time spent in defending the lawsuit should be included as expenses incurred "in connection with the motion." In the alternative, NRG and Knickrehm argue that if we find section 25 ambiguous, it should be interpreted broadly to avoid undermining the policy and purpose of the Act, which is to prevent defendants from bearing the costs of such suits. Further, NRG and Knickrehm argue that courts have held in other contexts that when awarding attorney fees, the fees are not to be "chopped" where the attorneys are dealing with a common core of facts and similar legal theories. Counsel for Hughes, Deets, the Deatherages, Petersen, and Shomaker makes the same

arguments as counsel for NRG and Knickrehm. Additionally, counsel argues that much of the fees that the trial court excluded were caused by plaintiff's actions, including: (1) plaintiff amended his complaint three times, requiring defendants to analyze and respond to four pleadings; (2) plaintiff sought discovery while the motions to dismiss were pending, requiring defendants to file motions to quash subpoenas and objections to interrogatories; and (3) plaintiff objected to Shomaker's request to file an additional motion to dismiss in response to the new allegations pleaded in the third amended complaint, requiring additional time expended on the defense. The Kueckers' counsel argues that the trial court improperly relied upon an affidavit by attorney Douglas Lee in determining that $200 per hour was a reasonable rate for attorneys in Lee County. Lee's affidavit was submitted by plaintiff. Counsel for the Kueckers submits that its affidavit asserting the rate of $215 per hour was consistent and should have been accepted by the court.

Defendants rely on Hensley v. Eckerhart, 461 U.S. 424, 426, 76 L. Ed. 2d 40, 46, 103 S. Ct. 1933, 1935 (1983), to support their position that their fees may not be "chopped" by claim or legal theory and that they are entitled to fees for their entire defense. We reject that Hensley is applicable here, for two reasons: (1) the issue in Hensley involved different claims that were intertwined and factually and legally related and proceeded to trial; and (2) the statute in Hensley broadly stated that " 'the court, in its discretion, may allow the prevailing party, *** a reasonable attorney's fee as part of the costs,' " and the Court found that it could not separate the costs among the claims. Hensley, 461 U.S. at 426, 76 L. Ed. 2d at 46, 103 S. Ct. at 1935, quoting 42 U.S.C. §1988 (1982). In Pietrzyk v. Oak Lawn Pavilion, Inc., 329 Ill. App. 3d 1043, 1051 (2002), the court distinguished Hensley when determining whether the plaintiff could recover attorney fees for her failed wrongful death claim under the fee provision of her successful Nursing Home Care Act (210 ILCS 45/1--101 et seq.

(West 1996)) claim. The court held that the plaintiff could not seek refuge under Hensley's "claim-chopping" protection where there was no confusion as to what portion of fees went towards the Nursing Home Care Act claim (the plaintiff's counsel was to receive one-third of the award). Pietrzyk, 329 Ill. App. 3d at 1051. The court stated that since common law prohibited a prevailing party from recovering attorney fees, statutes that allow such fees are to be strictly construed. Pietrzyk, 329 Ill. App. 3d at 1051. The court further stated that while the Hensley "common core of facts" doctrine could be used as a shield to prevent the reduction of attorney fees by "claim-chopping" based on the limited success of recovery, the doctrine may not be used as a sword to obtain fees that are not otherwise covered by the statute that authorizes such fees. Pietrzyk, 329 Ill. App. 3d at 1051. In this case, the motions to dismiss and costs related to them may be separated from other costs, such as costs for filing other motions and drafting other arguments not based on the Act within the motion to dismiss. Therefore, we do not find that we are bound by Hensley to accept any and all fees submitted by defendants.

We use the same statutory interpretation rules stated earlier in this opinion. Section 25 contains the language "in connection with the motion." The phrase "in connection with" has been deemed both ambiguous (Ness v. Ford Motor Co., 835 F. Supp. 453, 458 (N.D. Ill. 1993) (in context of insurance contract and construing ambiguity broadly and in favor of insured)) and unambiguous (Fuja v. Benefit Trust Life Insurance Co., 18 F.3d 1405, 1410 (7th Cir. 1994) (in context of medical insurance provision, construed narrowly)). The phrase may be read broadly, as defendants argue, or narrowly, as the trial court did. Under defendants' interpretation, reasonable fees may be collected for work performed researching and preparing all parts of the motions to dismiss as well as other costs incurred while the motion were pending, including responding to plaintiff's discovery motions.

The trial court interpreted section 25 narrowly to cover only the time it took defendants to research and draft their motions to dismiss under the Act, excluding all other costs related to other matters. We find the phrase "in connection with" as used in this statute to be ambiguous because it is capable of being understood in two or more different senses by reasonably well-informed persons. Certain work tasks, defendants argue, overlap between the Act and other defenses and are impossible to separate because the attorneys were faced with a common core of facts and law. Because we find section 25 to be ambiguous, we may look beyond its plain language to determine its meaning.

Defendants cite to Containment Technologies Group, Inc. v. American Society of Health System Pharmacists, No. 1:07--CV--0997 (S.D. Ind. August 26, 2009), which rejected the plaintiff's argument that the fee award should be limited to time spent actually preparing the motion to dismiss under Indiana's anti-SLAPP statute. However, that case is distinguishable because the language of Indiana's fee provision states that the prevailing defendant "is entitled to recover reasonable attorney's fees and costs." Ind. Code Ann. §34--7--7--7 (Michie 2008). The Indiana fee-shifting provision is void of the potentially limiting language in our state's provision, and thus the defendant was entitled to recover for all time reasonably spent on the litigation, not just the motion itself.

California's interpretation of its anti-SLAPP statute provides some limited guidance. California's anti-SLAPP fee-shifting provision, which does not contain the potentially limiting language "in connection with," states that "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." Cal. Civ. Proc. Code §425.16 (Deering 2010). In Kearney v. Foley & Lardner, 553 F. Supp. 2d 1178 (S.D. Cal. 2008), the court considered whether a defendant who succeeded in striking the plaintiff's state claims under the anti-SLAPP statute could recover fees for his motion to dismiss federal claims under different theories. The court

held that the defendant could recover fees for the entirety of the motion to strike and fees for the portion of his motion to dismiss the federal claims that was based on the Noerr-Pennington doctrine but no other fees for the remaining separate and distinct defenses. Kearney, 553 F. Supp. 2d at 1186-87. Therefore, even under California's broader fee-shifting provision, the court still limited recovery of fees to those associated directly with the anti-SLAPP motion.

Reading the entirety of the Act, we know that its purpose, in part, is to identify and adjudicate SLAPPs in an efficient manner and to provide for attorney fees and costs for prevailing movants. 735 ILCS 110/5 (2008). The Act also instructs that it "shall be construed liberally to effectuate its purposes and intent fully." 735 ILCS 110/30(b) (West 2008). From the legislative debates on the Act, we know that the Act was intended to eliminate ongoing, costly litigation by providing a special, expedited means to dismiss such lawsuits. See 95th Ill. Gen. Assem., House Proceedings, May 31, 2007, at 59 (statements of Representative Franks ("It's an expedited hearing they have to do within ninety (90) days and it also shifts the burden on the plaintiff and should the plaintiff lose, they'd have to pay the defendant's attorneys fees")). Based on this history and on the language of the Act, we conclude that the Act was intended to minimize attorney fees and litigation costs by providing defendants an avenue by which to easily and efficiently dispose of these types of lawsuits. We do not find that the language "in connection with" encompasses all costs of litigation, as defendants argue. Such a broad interpretation would defy logic where defendants pursue other defenses that are not connected to a motion under the Act. Considering the statute in its entirety, and the plain meaning of "in connection with," read in context of the statute and its purposes and intent, we believe that defendants are limited to recovering only those fees associated with bringing the motion to dismiss on grounds based on the Act, as the trial court determined.

That being said, we next consider whether the trial court's determination of "reasonable" fees was an abuse of discretion. In paragraph five of their joint motion for clarification of allowable attorney fees, defendants listed the following as "activities" that did not "fit comfortably" in the court's order to amend their fee petitions to include only those efforts directed at the Act:

"a) Intake communications with clients

b) Status communications with clients

c) Fact investigation

d) Witness and client interviews

e) Responding to discovery requests

f) Motion practice regarding staying discovery

g) Gathering and reviewing documents

h) Argument of the motion to dismiss, wherein numerous legal defenses are raised but not delineated

i) Preparation for argument of the motion to dismiss, for which time spent on particular legal defenses is not delineated

j) Attendance of status hearings and other hearings not specifically devoted to any particular legal defenses."

The trial court, in response to defendants' joint motion, issued its clarifying order. The clarifying order stated that defendants' motions raised various defenses, including the Act, the Illinois fair

reporting privilege, opinion speech, and the need to show actual malice.[4]  The court granted

defendants relief pursuant to the Act, and the Act allowed for fees associated with the motion.  The

court advised:

"Thus, the only fees which the Court can allow are those which can specifically be

allocated to the preparation and argument of the [Act] motion.  Therefore, none of the

activity set forth in paragraph 5 of the Defendants' joint motion should be included in the

attorney's fees calculation unless it can be specifically identified as pertaining to the

preparation and argument of the motion under the [Act].  The Court understands that this

may mean that some general time which [is] incapable of being delineated may not be

compensable to the Defendants. However, the statute limits attorney's fees compensation to

that which can be specifically related to the motion under the [Act]."

We do not find that the trial court's determination of fees and costs associated with the

motions brought under the Act was an abuse of discretion.  A defendant bears the burden of

presenting sufficient evidence from which the trial court can render a decision as to the

reasonableness of his fees.  Gambino v. Boulevard Mortgage Corp., 398 Ill. App. 3d 21, 66 (2009).

An appropriate fee consists of reasonable charges for reasonable services.  Gambino, 398 Ill. App.

3d at 66.  Justification of fees requires more than a mere compilation of hours multiplied by a fixed

hourly rate or bills issued to clients, as this type of data does not provide the court with sufficient

information as to the fees' reasonableness.  Gambino, 398 Ill. App. 3d at 66.  A petition for fees must

specify the services performed, who performed them, the time expended, and the hourly rate charged.

---

[4] These defenses were contained in defendants' motions to dismiss pursuant to section 2--615,

arguing that plaintiff failed to state a proper claim.

Gambino, 398 Ill. App. 3d at 66. "[I]t is incumbent upon the petitioner to present detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated." Gambino, 398 Ill. App. 3d at 66. The trial court's clarification order merely ordered defendants' attorneys to provide such details in their fee petitions. Defendants counter that it is impossible to separate the time spent on work related to the Act from that related to other defenses. However, the burden was on the attorneys to track their work in a detailed fashion.

Once a fee petition is submitted, the trial court considers factors including the skill and standing of the attorneys, the nature of the case, the novelty or difficulty of the issues involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client, and the reasonable connection of the fees to the amount involved in the litigation. Gambino, 398 Ill. App. 3d at 66. The trial court considered these factors and the affidavits submitted by the various defense attorneys and by plaintiff and determined that the hourly rates ranged from $140 to over $500. It determined that most of the rates were close to $200 per hour, and it determined that this was a reasonable hourly rate. We do not find that the trial court abused its discretion in setting the hourly rate at $200. The Kueckers[5] argues that the trial court did not hear testimony from attorney Lee regarding the reasonableness of the $200 rate. However, the trial court is not required to hold an evidentiary hearing on the reasonableness of attorney fees. Aurora East School District v. Dover, 363 Ill. App. 3d 1048, 1058 (2006). A nonevidentiary proceeding is proper so long as the trial court can determine from the available evidence what amount would be reasonable and the opposing party has an opportunity to be heard. Aurora East

---

[5] The remaining defendants do not take issue with the trial court's determination that $200 was a reasonable hourly rate.

School District, 363 Ill. App. 3d at 1058. In this case, the trial court had sufficient evidence before it, and plaintiff had an opportunity to be heard, to determine the reasonable fees to be awarded. We, therefore, affirm the trial court's judgment that the Act allows a prevailing defendant recovery for only those attorney fees associated with a motion based upon the Act, and we affirm the trial court's selection of a reasonable hourly rate of $200 and its award of reasonable fees.

We further reject defendants' arguments that limiting fees would have a "chilling effect" on citizens who desire to participate in government, because they would risk having to pay a majority of their attorney fees. Dixon & Giesen argues that "it is not reasonable to expect that an attorney could file a motion to dismiss under the [Act] without first having to take the steps necessary to determine the applicability of the [Act]. Under the trial court's narrow definition the fees generated to do intake communications with the client; investigate the facts; interview witnesses; attend general status or other court required appearances along with numerous other necessary steps in effective representation would not be included." This is not true under the trial court's or this court's order. If these tasks were performed in preparation of the motions to dismiss pursuant to the Act, the fees charged were recoverable. If those tasks overlapped issues, the attorneys were required to adjust the fees sought to reflect the time spent pursuing the motions based on the Act. While it may seem in defendants' view that the Act is impractical because it does not take into account that defense attorneys may litigate other defenses simultaneously, we remind defendants that it is not this court's place to rewrite the statute.

### III. CONCLUSION

We conclude that the trial court properly applied the Act and therefore properly dismissed plaintiff's complaint in its entirety. We further agree that the trial court properly limited attorney fees

to those associated with the motions brought under the Act and nothing more. Accordingly, we affirm the judgment of the circuit court of Lee County.

Affirmed.

O'MALLEY and SCHOSTOK, JJ., concur.